Gary W. FISHER, Appellant,

v.

IOWA BOARD OF OPTOMETRY
EXAMINERS, Appellee,

State of Iowa, Intervenor–Appellee.

No. 92–1949.

Supreme Court of Iowa.

Jan. 19, 1994.

Rehearing Denied Feb. 21, 1994.

David L. Brown of Hansen, McClintock & Riley, Des Moines, for appellant.

Mark McCormick of Belin Harris Lamson McCormick, A P.C., Des Moines, for appellee Iowa Bd. of Optometry Examiners.

Bonnie J. Campbell, Atty. Gen., Elizabeth M. Osenbaugh, Deputy Atty. Gen., and Rose Vasquez, Asst. Atty. Gen., for appellee State.

Considered by McGIVERIN, C.J., and HARRIS, CARTER, NEUMAN, and ANDREASEN, JJ.

HARRIS, Justice.

This is an appeal from a district court decision on judicial review of agency action in a contested case. The challenge is to a finding of "practice harmful or detrimental to the public." We affirm.

Petitioner Gary W. Fisher is a licensed Iowa optometrist. Respondent board of optometry superintends licensing of optometrists pursuant to Iowa Code chapter 147 (1989) and 645 Iowa administrative code 180.-112(1)(c) (1989). Fisher was charged with misconduct incident to physical examination of women. The notice of hearing and statement of charges accused Fisher of "engaging in unethical conduct or practice harmful or detrimental to the public," language taken verbatim from Iowa Code section 147.55(3) (grounds for revocation or suspension of license of health care professional person). The matter proceeded to hearing at which several women testified that Fisher had asked them to remove all clothing above the waist so he could conduct scoliosis examinations. With one exception the women were upset and felt violated by the procedure.

Fisher testified that conducting a scoliosis examination to determine the source of eye problems is an accepted, although rare, practice in the field of optometry. This opinion was generally supported by an optometrist friend of Fisher who testified as an expert witness. The expert did not perform such examinations himself. He said scoliosis patients "seem to complain a lot of ocular problems, including headaches, eye fatigue and

tiredness." Fisher testified he never made sexual advances or fondled any of his patients, and none of the women testified he did.

Fisher testified that his optometrist father was the first person to mention to him the potential relationship between eye problems and scoliosis. He acknowledged it was not a part of his curriculum in school but said he reviewed medical literature and found mention of the possible correlation. Fisher began scoliosis screenings as a part of his physical assessment procedures in his office approximately three years previously. He conducted the examination rarely, and mostly on young women. He performed the test with the patient nude from the waist up and without a third person in the room.

The case is somewhat unusual in that it yielded two successive and somewhat contrary decisions. The first concluded Fisher "was honestly attempting to provide the best care for his patients, and did not engage in unethical conduct, or practice harmful or detrimental to the public." The initial decision concluded that a licensed optometrist may conduct such screening if the optometrist believes an eye condition may be related to scoliosis. Because it found Fisher held such a belief and had been motivated by an intent to care for his patients, the board decided his actions were within the scope of his professional practice and dismissed the charges.

The case had stimulated considerable coverage in the news media and, certainly not surprisingly, the board's initial decision precipitated enormous publicity and criticism. The assistant attorney general who had represented the board at the initial hearing filed a petition for rehearing on behalf of the State. A second attorney general moved to intervene on behalf of the Iowa board of

medical examiners,[1] an attempt that was rejected as untimely.

Reacting to the petition for rehearing, the optometry board reconvened and, although no additional evidence was received, reconsidered the matter and issued an amended decision. It again found that Fisher had been prompted by a wish to help his patients and found him innocent of unethical conduct. The amended decision again found Fisher had not harmed his patients but this time found his conduct "harmful and detrimental to the public," in violation of Iowa Code section 147.55(3) and 645 Iowa administrative code 180.112(1)(c), because it was an unreasonable intrusion upon his patients' expectation of privacy. The board specifically noted that scoliosis screening "should not be done as a part of an eye examination by any Iowa optometrist." The board therefore placed Fisher on three years probation with conditions.

Fisher then sought judicial review. At this point the board obtained its present, private counsel. The State thereafter petitioned to intervene.[2] The matter is before us on Fisher's appeal from a district court judgment affirming agency action.

I. Judicial review of contested proceedings, both in district court and in the appellate courts, is reviewed to correct errors at law. Iowa Code § 17A.19. We also reverse if the agency decision is unsupported by substantial evidence. *Northwestern Bell Tel. Co. v. Iowa State Commerce Comm'n,* 359 N.W.2d 491, 495 (Iowa 1984). Constitutional issues are reviewed de novo. *Office of Consumer Advocate v. Iowa State Commerce Comm'n,* 465 N.W.2d 280, 281 (Iowa 1991).

II. Fisher first asserts that the Iowa Code provision and administrative rule which constituted the grounds for the board's ac-

---

1. Fisher's conduct was initially investigated by the Iowa board of medical examiners. That board reported Fisher's conduct to the optometry board which treated the report as a complaint. After its own resulting investigation was completed, the optometry board proceeded with the charge against Fisher.

2. Fisher resisted the State's petition to intervene and requested the board be ordered to provide him with tapes of the closed session in order to

determine whether any outside influences were responsible for the amended decision. We granted interlocutory appeals on both issues. We permitted the attorney general to intervene on behalf of the State and held Fisher was not entitled to examine the deliberative tapes. *See Fisher v. Iowa Bd. of Optometry Examiners,* 478 N.W.2d 609 (Iowa 1992); *Fisher v. Iowa Bd. of Optometry Examiners,* 476 N.W.2d 48 (Iowa 1991).

tions were vague and overbroad, both on their face, and as applied to him.[3]

■ A statute is overbroad "if it attempts to achieve a governmental purpose to control or prevent activities constitutionally subject to state regulation by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *State v. Pilcher,* 242 N.W.2d 348, 353 (Iowa 1976). The overbreadth analysis ordinarily is applicable only when first amendment rights are implicated. *City of Maquoketa v. Russell,* 484 N.W.2d 179, 181 (Iowa 1992). Because Fisher does not claim any violation of first amendment rights, he lacks standing to assert an overbreadth challenge, either facially or as applied.

■ Fisher also challenges the statutory and administrative rule language as being unconstitutionally vague under the due process clauses of the United States and Iowa Constitutions, a challenge we also find to be without merit. We explained the vagueness challenge in *Eaves v. Board of Medical Examiners,* 467 N.W.2d 234, 236 (Iowa 1991) (citing *Knepper v. Monticello State Bank,* 450 N.W.2d 833, 838 (Iowa 1990)). A civil statute is unconstitutionally vague under the due process clauses only when its language does not convey a sufficiently definite warning of proscribed conduct as measured by common understanding or practice. Vagueness exists when persons must necessarily guess at the meaning of a statute and its applicability. A party attacking the constitutionality of the statute must overcome a presumption of constitutionality by negating every reasonable basis on which the statute can be sustained. *Eaves,* 467 N.W.2d at 236; *Knepper,* 450 N.W.2d at 838.

We have also recognized that in "regulating certain matters a degree of indefiniteness is necessary to avoid unduly restricting the applicability of the proscribing rule." *Eaves,* 467 N.W.2d at 236. "Regulation of the medi-

cal profession requires flexibility," and "the limits between good and bad professional conduct can never be marked off by a definite line of cleavage." *Id.* We noted that "it would be impossible to catalog all the types of professional misconduct." *Id.*

Fisher was found to be in violation of a rule promulgated under the same Iowa Code provision assailed in *Eaves.* Under this provision Fisher was held to the minimally acceptable standards of care accepted in the field of optometry. Fisher is deemed to have been on notice of these standards and was properly held accountable when he violated them. We think the statute and the rule cannot be considered vague.

■ In arguing that the statute was vague as applied to him, Fisher contends that his scoliosis procedures were within the realm of minimally competent care and therefore could not be found to violate the statute. The district court was correct in rejecting this argument. As the optometry board held in its amended decision, and we emphatically agree, scoliosis procedures were without, rather than within, the realm of competent care for an optometrist. We think the statute's proscription of practices that are harmful or detrimental to the public was sufficient to inform Fisher he ought not conduct the tests. Fisher's admission that he made mistakes and was not properly sensitive to the needs of his patients is a strong indication that he was so informed.

■ III. Fisher argues the board's combination of investigative, prosecutorial, and adjudicative functions violates the due process clause of the fourteenth amendment to the United States Constitution and article I, section 9 of the Iowa Constitution. Iowa Code section 17A.17(3) also prohibits individuals who prosecute a contested case from participating in the making of any decision. We have said that the

---

3. Iowa administrative code chapter 645, 180.-112(1)(c) implements and incorporates the language of Iowa Code § 147.55(3).

The statute provides:

A license to practice a profession shall be revoked or suspended when the licensee is guilty of any of the following acts or offenses:

. . . .

3. Knowingly making misleading, deceptive, untrue or fraudulent representations in the practice of a profession or engaging in unethical conduct or practice harmful or detrimental to the public. Proof of actual injury need not be established.

contention that the combination of investigative and adjudicative function necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgement that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

*Hartwig v. Board of Nursing*, 448 N.W.2d 321, 323 (Iowa 1989) (citing *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712, 723–24 (1975)).

Fisher points out that the board was involved at the investigatory level because all members of the board were privy to information generated by the Iowa board of medical examiners' preliminary investigation, prior to the filing of charges. Although the board later appointed an independent investigator, Fisher asserts that this prior knowledge contaminated the proceedings. He also contends that the second hearing, held in closed session with no additional evidence taken, created a strong likelihood of prejudgment. We upheld the petition for rehearing on Fisher's first appeal. *See Fisher*, 476 N.W.2d at 51. We continue to be unpersuaded that there was any bias.

Given the presumption of honesty and integrity in the board, and the fact the board appointed an independent investigator, Fisher simply failed to satisfy the high burden placed on those challenging agency action.

Fisher also argues that the board's role as adjudicator mixed with the prosecutor's role in such a way as to violate his right to due process. The Iowa administrative act explicitly forbids the combination of prosecutorial and adjudicative functions. Iowa Code § 17A.17(3). We likewise have held that due process is violated when an agency is solely responsible for investigation, instigation, prosecution, and decision-making. *Keith v.*

*Community Sch. Dist. of Wilton*, 262 N.W.2d 249, 260 (Iowa 1978).

Fisher notes that the complaint against him was prosecuted through the board's own legal counsel, an Iowa assistant attorney general. After the board's initial finding this attorney is said to have switched roles and filed a petition for rehearing on behalf of the State. Fisher thinks these dual roles allowed the board to act as both adjudicator in the original hearing and as prosecutor in the subsequent hearing.

We fail to see how the assistant attorney general caused the board to become a prosecutor. The assistant attorney general did at times advise the board in its rulemaking and complaint-filing capacity. But this fact did not, standing alone, impute the prosecutorial role to the board. The board did not prosecute the case; the attorney general did. It is neither unlawful nor uncommon for the attorney general to both give advice to various administrative agencies, and thereafter prosecute actions brought by the agency.

In Fisher's first appeal we held that the attorney general's office was entitled to file a petition for rehearing before the board. *Fisher*, 476 N.W.2d at 51.

IV. Fisher complains that extensive media coverage and criticism influenced the board's decision on rehearing in violation of his right to due process. Although Fisher strongly contends otherwise, we think this issue was decided adversely to him on the basis of preservation in one of his prior appeals. *Fisher*, 478 N.W.2d at 612. The matter is established as the law of the case. *State v. Grosvenor*, 402 N.W.2d 402, 405 (Iowa 1987).

Fisher also suggests that the amended decision was unsupported by substantial evidence, a suggestion we also reject. Evidence is unsubstantial when a reasonable mind would find the evidence inadequate to reach a conclusion. *City of Davenport v. Public Employment Relations Bd.*, 264 N.W.2d 307, 311 (Iowa 1978). A reviewing court must grant appropriate deference to the agency's expertise and "broadly and liberally apply the board's findings in order to uphold rather than defeat the decision." *Al-*

**878**

*uminum Co. of Am. v. Employment Appeal Bd.,* 449 N.W.2d 391, 394 (Iowa 1989). The ruling at issue here is the board's finding that Fisher's practice of screening patients for scoliosis was "harmful or detrimental to the public." We think the board's amended decision was eminently correct, and, under the facts we have explained, supported by substantial—even overwhelming—evidence.

The explanation for this two-phase administrative proceeding is plain enough. The initial board decision overfocused on Fisher's subjective motivation and found that the examinations were not prompted by a prurient interest. From the extensive record on the point it is obvious that there are many doubters, but Fisher's evidence supports the finding and we of course are bound by it. This finding, and the initial decision's focus, somehow led to the incorrect intimation that the limits of Fisher's field of professional competence had not been breached.

The amended decision properly corrected this intimation. Optometrists have no business, even if somehow convinced of its propriety, undertaking examinations beyond their competence, such as scoliosis examinations. To do so is a threat to the public, and the board was eminently correct in disciplining Fisher for doing so.

The broader lesson of the case is also obvious. It was known to the learned professions from earliest times and must be understood by all persons working in those fields which, like optometry, have come to be called professions. A person acting in a professional role can have a disproportionate influence on those they serve. They owe to the public a solemn duty to use their considerable influence with utmost discrimination. The metes and bounds of propriety in any professional relationship must be observed scrupulously because the professional role is held in trust.

There was no error.

**AFFIRMED.**