**STATE of Iowa, Appellee,**

v.

**Scott C. TYLER, Appellant.**

**No. 92–1952.**

Supreme Court of Iowa.

Feb. 23, 1994.

Considered by McGIVERIN, C.J., and HARRIS, CARTER, SNELL, and ANDREASEN, JJ.

HARRIS, Justice.

This complicated story begins in 1983 when defendant Scott Tyler received a cordless telephone as a father's day gift. The State intercepted Tyler's conversations on the telephone and this led, in a prior prosecution, to his conviction on two counts of first-degree theft. Because the State intercepted the messages without a search warrant, the taped conversations were suppressed in that trial, but Tyler was nonetheless convicted and served ninety days before he was released on probation.

Following his release Tyler filed a suit in federal court against Scott County and others, charging that monitoring his cordless telephone violated his civil rights. The federal district court granted summary judgment against Tyler, holding the intercepted conversations were not "wire" communications within the meaning of the federal wiretap law. The judgment was affirmed on appeal to the circuit court of appeals, 877 F.2d 705. A petition for writ of certiorari on Tyler's behalf was filed with the United States Supreme Court. It was denied and there was no request for rehearing, 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743.

Tyler then began lobbying Congress to ensure privacy in cordless telephone conversations. As part of his campaign he sought to have the federal wiretap Act retroactively preclude the warrantless interception of cordless telephone conversations, which he somehow hoped would allow him to "reinstitute" his action against Scott County. Tyler raised money to finance his litigation and lobbying efforts. The present prosecution arose from that campaign.

The grand jury indictment alleged five counts of securities fraud violations. Each count charged that Tyler did by the use of misleading, incomplete or incorrect information, sell, or offer to sell securities to several named individuals in violation of various provisions of Iowa Code chapter 502 (1991).

Gary K. Koos of Koos Law Firm, P.C., Davenport, for appellant.

Bonnie J. Campbell, Atty. Gen., Robert P. Ewald, Asst. Atty. Gen., and William E. Davis, County Atty., for appellee.

The people named had all provided money for Tyler's litigation and lobbying efforts.

Tyler's publicity and lobbying campaigns were financed by backers who contributed to the "National Cordless Phone Privacy Advocacy Group," of which he was president. The largest contributor was a mechanical engineer who provided Tyler about $210,000. William Reynolds provided Tyler about $62,000. William's father, Charles Reynolds, provided Tyler $26,000. Jeanine Cassatt provided Tyler $2000. Peggy Padget provided Tyler a check for $2000. Linda Harris "loaned" him $10,000. Valerie Weeks loaned him $3500. In all Tyler claimed to have received $600,000 to $700,000 from his backers.

The primary factual issue at trial was whether the payments made to Tyler by Padget, Cassatt, Weeks, Harris and Charles Reynolds were legitimate contributions in support of a political cause, or whether they were investments made with the inducement of receiving a tenfold or higher return after Tyler "reinstated" his lawsuit against Scott County.

The jury found Tyler guilty on the first two counts. The third count was dismissed. The district court declared mistrials on the other two counts. Tyler was sentenced to imprisonment and the matter is before us on Tyler's appeal.

Because the assignments tend to be overlapping and commingled, they will not necessarily be discussed separately or in the order presented. We have taken care to consider all of Tyler's arguments but, to avoid unnecessarily extending this opinion, have rejected some without comment.

I. Tyler contends that prosecutorial misconduct before the grand jury so tainted the proceeding as to deny him due process. He argues that the "prosecutor made himself a witness." Tyler asserts the prosecutor also backed his factual statements up in the press. "Throughout the case," Tyler says, "the overzealous prosecution of Mr. Tyler continually tainted an objective view of the facts and law."

■ It is clear that prosecutors have the right

to examine witnesses, present documents, explain law, summarize the evidence, and request an indictment. The prosecutor is barred from expressing opinions on the facts and from attempting to influence the grand jury's action [but] . . . [p]rosecutorial misconduct infringes due process when a reasonable likelihood exists that it may induce action other than that which the grand jurors in their uninfluenced judgment would take.

*State v. Paulsen*, 286 N.W.2d 157, 160 (Iowa 1979) (citations omitted).

■ Some of Tyler's criticism is well taken; the prosecutor here did testify by interjecting his personal knowledge before the grand jury. But there was no reversible error. For reversible error Tyler must show that any prosecutorial misconduct made it impossible for him to have a fair trial. *State v. Hall*, 235 N.W.2d 702, 712–13 (Iowa 1975). It is significant, though not controlling, that none of the prosecutor's remarks of which Tyler complains were heard by the jury that convicted him. *Id.* at 713. We reject the assignment because there is nothing to indicate that anything the prosecutor said to the grand jury, or to the press, had any impact on the trial jury's deliberations.

II. The elements of a securities fraud under Iowa Code sections 502.401 and 502.605 (1991) are:

(1) The defendant sold or offered to sell a security;

(2) The defendant willfully and knowingly either

(a) Made an untrue statement of material fact, or

(b) Omitted a nonmisleading statement of material fact and, under the circumstances, the omission rendered defendant's statements misleading.

(3) The defendant did so with a specific intent to defraud.

■ Tyler claims the only statements he made were ones of legal opinion and contends that statements of legal opinion cannot be grounds for fraud. To a point he is correct. The statute under which Tyler is charged requires the showing of an "untrue

statement of material fact" or the omission of a "material fact." Iowa Code § 502.401(2). A legal opinion is normally insufficient to establish this element of the offense.

■ The statute is consistent with common-law fraud. Representations or statements concerning domestic law normally are not regarded as representations of fact and therefore no action for fraud arises even when they are false. 37 Am.Jur.2d *Fraud and Deceit* § 73 (1968); *see International Milling Co. v. Gisch,* 258 Iowa 63, 73, 137 N.W.2d 625, 631 (1965) (referring to opinion and fraud generally). But when the statements become representations of fact, they may be treated as fraudulent. Restatement (Second) of Torts § 545 (1992); *see Gisch,* 258 Iowa at 73, 137 N.W.2d at 631.[1] This is entirely consistent with our past cases on the subject. *See Hoefer v. Wisconsin Educ. Ass'n Ins. Trust,* 470 N.W.2d 336, 340 (Iowa 1991).

■ These common-law fraud principles cast light on the meaning of securities fraud under the statute. It is a sound rule that protects a person accused of a crime whose only wrong is an honest misapprehension of the law. But this rule does not necessarily protect Tyler. Fraud cannot be defended on the sole basis that it grew out of a losing lawsuit. According to the State's evidence, Tyler's lawsuit was a fantasy, one in which he could not and did not believe. His suit after all was to be reinstated under unlikely federal legislation changing the law and, more improbably, making the change retroactive. Most of all it was to be reinstated notwithstanding the absolute impediment of overcoming the rule of stare decisis because of his prior adverse judgment. *See State ex rel. Lankford v. Mundie,* 508 N.W.2d 462, 563 (Iowa 1993) (legislation cannot affect existing court judgment).

Kathy Russell had worked with Tyler in her capacity as congressional counsel for the senate committee on technology and law.

She spoke to one of Tyler's lobbyists over the phone. In that recorded conversation, Russell stated that:

> I cannot imagine a situation in which we would make this [bill] retroactive, assuming we did ... I've told Scott [Tyler] a hundred times, that it was not our intent in 1986 to cover cordless phones, and for us to say that now is silly. That's not going to happen. But, you know, it doesn't seem to sink in....

Tyler himself informed this lobbyist, again during a recorded phone call, of his lack of intent to refile a suit and the lobbying effort's failure to produce enactment of retroactive legislation.

At trial Tyler was very vague about the source of his reinstatement theory which he referred to as "original intent." At one point he attributed it to a Harvard University law professor, but retreated on cross-examination. Tyler also implied in a press release that a Steve Shapiro, an attorney with the American Civil Liberties Union, espoused the theory. But Shapiro forced him to publish a disclaimer.

Tyler nevertheless persisted in soliciting money from Peggy Padget. A letter, mailed to Padget by one of Tyler's supporters, reiterated the chances of winning the refiled $53 million lawsuit against Scott County. This supporter, Linda Harris, later showed Padget a promotional video and encouraged investment in the case. Tyler arrived and told Padget the suit was still pending. It was at this time that Padget "loaned" the cause $2000 under a note that allowed for repayment plus $20,000 at the suit's completion. Harris provided Padget with a $2000 check to cover repayment, but payment was stopped.

Jeanine Cassatt was also solicited by Linda Harris. She too "loaned" Tyler $2000. It was her understanding that the money would be used to support his congressional lobbying and lawsuit. As with the Padget transaction,

---

1. The distinction is driven by the existence of justifiable reliance. Because all are presumed to know the law and are bound to take notice of it, it cannot be said that a purely legal opinion could deceive. 37 Am.Jur.2d *Fraud and Deceit* § 73. However, "if a misrepresentation as a matter of law includes expressly or by implication, a misrepresentation of fact, the recipient is justified in relying upon the misrepresentation of fact to the same extent as though it were any other misrepresentation of fact." Restatement (Second) of Torts § 545.

Tyler knew there was no real possibility that retroactive legislation would be passed but still insisted the suit would be successful in his discussions with Cassatt.

It is almost unnecessary to say that Tyler sold Padget and Cassatt interest in a totally worthless lawsuit. It would be ludicrous to think otherwise. We emphasize the worthlessness of Tyler's suit to underscore the State's point that Tyler could not, in fact did not, believe in it. The State's evidence on this point is directed to Tyler's understanding of his suit. It is a factual, not a legal, matter. And the question whether a given legal opinion is of a quality or character constituting a misstatement of fact is one f r the jury. *Gisch*, 258 Iowa at 73, 137 N.W.2d at 631. The trial court thus correctly submitted the matter as a factual dispute to the jury. The jury instructions were not the subject of any objections.

III. Tyler asserts that the transactions in count I (Padget) and count II (Cassatt) did not involve "securities" and therefore could not have violated Iowa Code section 502.401 which as an element, requires the sale of a security. The term " '[s]ecurity' means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in a profit sharing agreement; ... investment contract; ... or, in general, any interest or instrument commonly known as a 'security'...." Iowa Code § 502.102(14) (1993). This statutory language was incorporated into one of the jury instructions. The State relies on its trial theory that the transactions involved "investment contracts."

Iowa Code section 502.102(14) is substantially similar in pertinent part, and was modeled after, § 3(a)(10) of the 1934 Securities Exchange Act. *See* 15 U.S.C. § 78c(a)(10) (1993). Because of this we view cases interpreting § 3(a)(10) as persuasive.

■ The United States Supreme Court has outlined general principles and a test to determine when a security exists under § 3(a)(10). The Court is not bound by legal formalisms, but instead takes "account of the economics of the transactions under investigation." *Reves v. Ernst & Young*, 494 U.S. 56, 61, 110 S.Ct. 945, 949, 108 L.Ed.2d 47, 57

(1990). The Court adopted a test for determining when an "investment contract" is a security. An investment contract is a security if it evidences "(1) an investment; (2) in a common enterprise; (3) with a reasonable expectation of profit; (4) to be derived from the entrepreneurial or managerial efforts of others." *Id.* at 64, 110 S.Ct. at 950, 108 L.Ed.2d at 59. The only seriously contested elements here are (1) investment and (2) expected profits.

■ Padget loaned Tyler $2000 which was due, without interest, on July 1, 1992. The transaction was evidenced by a written instrument that additionally provided payment of $20,000 to "be paid upon completion of my lawsuit...." The instrument clearly evidences an investment.

There was a reasonable expectation of profit because the note evidenced a required $20,000 payment contingent upon suit completion. Padget's testimony supported a finding that she believed she would at some time receive a profit. The jury could find that a reasonable person, provided only with the information Padget had, would believe a profit was likely.

The Cassatt transaction was identical except no writing evidences it. While the loan of $2000 was primarily to aid Tyler's lobbying efforts, Jeanine Cassatt also expected a profit. Again, an objective person with the limited information held by Cassatt could reasonably expect profits from the investment.

We conclude the transactions were securities.

■ IV. We find no abuse of discretion in evidentiary rulings that are the subject of separate assignments. In one, Charles Reynolds—the alleged victim in count V—was allowed to testify although the State did not file minutes of his testimony as required for State witnesses by Iowa rules of criminal procedure 4(5) and (6). Reynolds' name was typed into the indictment but no other notice was provided indicating he would appear as a witness. Reynolds' testimony before the grand jury was available to Tyler, and his

counsel had possession of the transcript long before trial.

Even if abuse and prejudice are assumed, the question is moot. Because the jury was unable to reach a verdict on this count, a mistrial was declared. Recurrence of the problem is unlikely should the State elect to retry this count. We cannot believe there was any prejudice regarding other counts from Reynolds' testimony.

Tyler also complains because an expert witness was allowed to testify concerning the validity of the planned re-establishment of his lawsuit. Even assuming abuse there was no prejudice because, as we have already indicated, no witness could establish validity to his suit. On two other assignments we find no abuse in admitting evidence of audiotapes or in denying Tyler's motion for change of venue.

■ V. We do find merit in one of Tyler's assignments. The alleged victim in count IV, Linda Harris, was not produced by the State at the time of trial. Tyler sought a dismissal that would have prevented retrial of the count. The court found that Harris was unavailable as a witness under Iowa rule of evidence 804 and therefore entered mistrial on the count. If the mistrial was properly entered, the State may retry Tyler on the same charge. *State v. Watts,* 244 N.W.2d 586, 588 (Iowa 1976). The decision to grant or deny a motion for mistrial is generally reviewed for abuse of discretion. *Id.* A state may not put a defendant in jeopardy twice for the same offense. *Arizona v. Washington,* 434 U.S. 497, 503, 98 S.Ct. 824, 829, 54 L.Ed.2d 717, 726 (1978). This right attaches before final judgment and includes the defendant's "valued right to have his trial completed by a particular tribunal." *Id.,* 434 U.S. at 503, 98 S.Ct. at 829, 54 L.Ed.2d at 727. Where unavailability of critical prosecution evidence is the basis for the mistrial, the strictest scrutiny is appropriate. *Id.* at 508, 98 S.Ct. at 831, 54 L.Ed.2d at 730. This scrutiny is available to the defendant not only at the time of the second trial in a claim of former jeopardy, but also in challenging the actual entry of mistrial on direct appeal. *See id.* at 498, 98 S.Ct. at 826, 54 L.Ed.2d at 723 (former jeopardy claim considered by

federal court on writ of habeas corpus to the state court that declared the mistrial).

Harris was a valuable State witness. She was Tyler's associate in his efforts to lobby Congress, as well as an investor in his scheme. She was alleged to be Tyler's victim in one count. The State admits it undertook no extraordinary efforts to secure Harris's presence but explains this was because she was also a defense witness.

The State had ample time and opportunity to secure Harris's presence and failed to do so. It had no right to rely on the defense to produce a critical prosecution witness. In light of constitutional prohibitions against former jeopardy, Tyler had a right to dismissal with prejudice on this count. Tax costs ninety percent to Tyler, ten percent to the State.

**AFFIRMED IN PART AND REVERSED IN PART.**

All Justices concur except CARTER, J., who dissents.

CARTER, Justice (dissenting).

I dissent.

Irrespective of the frauds that defendant may have perpetrated or the crimes he may be guilty of, he is not guilty of securities fraud under the definition of "security" that this court has fashioned. Under that definition, it is necessary that the arrangement or scheme that the State claims to be a security evidence a reasonable expectation of profit "to be derived from the entrepreneurial or managerial efforts of others."

The majority's conclusion that the backers' anticipated profits were to be derived from the managerial efforts of Tyler's National Cordless Phone Privacy Advocacy Group is not sustainable. It appears without dispute that any anticipated profits from the transactions upon which the present prosecution is based would be entirely dependent on the amount to be recovered in a proposed "reinstated" lawsuit against Scott County. Given the theory of the proposed litigation, such recovery, if realized, would be compensation for provable injury sustained by the plaintiff as a result of alleged violations of constitu-

tional rights by law enforcement officials. Those alleged violations occurred prior to the time that Tyler's advocacy group was formed. The recovery would simply be the product of applying the law to events that antedated the formation of that organization.