STATE of Iowa, ex rel. Thomas J. MILLER, Attorney General of Iowa, and Craig A. Goettsch, Iowa Superintendent of Securities, Appellees,

v.

Edwin PACE, an Individual, Appellant.

No. 02–1726.

Supreme Court of Iowa.

April 7, 2004.

Dennis M. Lawyer of The Lawyer Law Firm, Indianola, for appellant.

Thomas J. Miller, Attorney General, and Chantelle Smith and Benjamin E. Bellus, Assistant Attorneys General, for appellees.

TERNUS, Justice.

The defendant, Edwin Pace, appeals a district court judgment finding he had violated various state laws in his marketing and sale of payphones, awarding monetary remedies and penalties, and granting injunctive relief. He contends the district court erred (1) in ruling the program he sold—the sale and leaseback of payphones—was a security, and (2) in finding he was not entitled to the lack-of-knowledge defense available to "affiliates" under Iowa securities law. Pace also asserts the State failed to prove he committed unlawful practices under Iowa's consumer fraud law. Finally, he claims his due process rights were violated, as well as the constitutional prohibition against ex post facto laws. On our de novo review, we find no error in the trial court's decision and, accordingly, we affirm.

I. Background Facts and Proceedings.

The defendant has been a licensed insurance agent for over twenty years. He was also licensed to sell securities for several years but his license had lapsed prior to

the sales at issue in this case. During the period giving rise to this litigation, Pace marketed products primarily to the elderly and frequently represented himself as a "senior advisor."

Beginning in 1997, but primarily in 1999 and continuing through June of 2000, the defendant sold payphones, known as customer-owned, coin-operated telephones (COCOTS), in Iowa. Three ownership options were available to Pace's clients. Under the first option, the investor would own the payphone and be totally responsible for its placement and operation. Once a location was determined, however, a management company would provide services relating to installation, maintenance, and repair of the COCOT for $40–$50 per month. The investor assumed the risk of profit or loss under this plan. Under the second option, the investor paid the management company a monthly fee of $75–$82 to provide all the required services, including finding a location for the phone. As with the first option, the investor experienced any profits or losses generated by the COCOT. Under the third plan, the investor entered into an agreement to purchase a payphone and then simultaneously leased the payphone to a management company. The payphone was then delivered directly to the management company for placement and operation. During the three to five year term of the lease, the investor had no involvement in the day-to-day operation of the payphone; all management rights rested in the management company in exchange for a monthly payment of $75–$82 to the investor.

Although all three options were theoretically available to Pace's clients, as a practical matter, investors were only interested in the sale/leaseback plan because they had no expertise in operating or ability to manage a payphone. Thus, Pace focused his sales presentations on the third option and, in fact, the only COCOTS actually sold by the defendant were under the sale/leaseback plan.

Pace worked with a number of marketing companies, including Tri–Financial Group, BEE Communications, and ATC, Inc. Each company selling payphones was associated or affiliated with a particular management company. Although Pace claimed only to sell payphones and to have no relationship with the management companies, he would forward a request for lease information directly to the management company upon an investor's decision to go with the sale/leaseback option. Each payphone was sold for $5000 to $7000, and Pace earned a commission of between 10–12% on each sale.

On September 24, 1999, the Iowa Securities Commission issued a cease and desist order to Tri–Financial Group and its management company, Phoenix Telecom. In this order the Commission asserted COCOTS were securities as defined in Iowa Code section 502.102(19) (1999), and they were not registered as required by Iowa Code section 502.206. Tri–Financial and Phoenix Telecom were alleged to have violated Iowa Code section 502.201 through their offer and sale of unregistered, nonexempt securities. They were ordered to cease and desist.

The Commission's order was a public record, but Pace claimed to have no knowledge of it. Nonetheless, Pace made no further sales through Tri–Financial after this order was issued. He did, however, continue to sell COCOTS through other marketing companies.

On May 31, 2000, the Iowa Securities Bureau wrote to Pace informing him it had information he was selling COCOTS through BEE Communications and its management company, ETS Payphones, Inc., neither of which was registered to sell securities in the State of Iowa. The Bureau

told the defendant it believed the sale/leaseback program he sold was an investment contract and subject to registration under Iowa Code chapter 502. Pace was informed that the broker-dealer and agent licensing requirements of section 502.301 may also have been violated, which could result in civil and criminal penalties. The letter ended by stating that Pace may be involved in activity that violates Iowa law and that if he had any questions about the legality of his activities, he may wish to consult an attorney. Shortly after Pace received this letter, he was notified by BEE Communications that it would not be selling COCOTS in Iowa until the questions raised by the Bureau had been resolved, even though no cease and desist order had been issued.

Pace contended at trial that based on these communications, he thought only payphones sold through BEE Communications did not comply with Iowa law and that the noncompliance was due to the company's failure to make the required filings with the Bureau. He testified he thought other COCOTS were not affected by the Bureau's inquiries, and therefore he continued to sell COCOTS through other marketing companies.

On July 10, 2000, Pace received a second letter from the Bureau, which was very similar to the first letter. The second letter, however, also made specific reference to ATC, Inc. and its management company, Alpha Telecom. Pace was again informed that these companies were not registered with the State of Iowa to sell securities; that sale/leasebacks of payphones were securities requiring registration of the security and the selling agent; and that by selling COCOTS, Pace may be in violation of Iowa law. The defendant stopped selling payphones after he received this letter.

Within several weeks two management companies, ETS and Alpha Telecom, declared bankruptcy. ETS claimed that it, not the investors, owned the payphones. (In fact, the bankruptcy court made a determination that the payphones were owned by ETS.) After the bankruptcy proceedings were filed, the investors no longer received their monthly lease payments.

On September 17, 2001, the State filed a petition charging Pace with violations of the Iowa Uniform Security Act, Iowa Code chapter 502, the Iowa Business Opportunity Act, Iowa Code chapter 523B, and the Iowa Consumer Fraud Act, Iowa Code section 714.16. At trial, the facts previously reviewed were brought out. In addition, several investors testified about the information given to them by Pace. They said Pace told them they would own the payphones; they could cancel the lease at any time and receive a refund of all or some portion of the purchase price; the management companies were financially strong; there was little risk in this investment and the investors would receive a return of 13–14%; and that COCOTS were legal in Iowa. One witness testified that Pace even told an elderly investor that COCOTS were fully insured by Lloyds of London.

The State also called a financial expert who had reviewed the financial statements of ETS. He testified that it was "obvious" the phone program could not be maintained without the continuous sale of payphones because the only way the lease payments could be made was through proceeds from future payphone sales.

In its subsequent decision, the district court made factual findings consistent with our review of the pertinent facts. The court found that even though material was available to Pace indicating significant legal issues with COCOTS across the country, he continued to represent to pro-

spective purchasers that there were no concerns with selling the product in Iowa. He also repeatedly represented to potential investors that they would realize immediate and significant income from the ownership of a COCOT, that the COCOT was a liquid and safe investment, and that the COCOT was recession proof.

With respect to the allegations of securities law violations, the district court concluded: (1) the sale/leaseback program was an investment contract subject to regulation under chapter 502, see Iowa Code § 502.102(19) (including an investment contract in the definition of a "security"); (2) Pace violated the statutory prohibition against the offer and sale of an unregistered security, see id. § 502.201(1); and (3) Pace violated the statutory prohibition against the sale of a security by an unregistered agent, see id. § 502.301(1). The district court also held that all three options offered by Pace constituted a "business opportunity" as defined in section 523B.1(3)(a). Because option three—the sale/leaseback option—violated the more stringent securities law, the court ruled only offers of options one and two violated section 523B.2, prohibiting the sale of unregistered business opportunities in Iowa.

The court also held Pace committed securities fraud and business opportunities fraud by making false representations and failing to disclose facts key to an investor's informed investment decision. See id. §§ 502.401(2), 523B.12. Based on the same representations and omissions, the trial court concluded Pace's conduct constituted an "unfair practice" and "deception" under the consumer fraud provision of chapter 714. See id. § 714.16. Because the court found Pace's violations were committed against "older persons," the court held the additional civil penalties of section 714.16A applied.

The district court ordered Pace to pay restitution in the amount of $302,000. See id. §§ 502.501(1) (providing for restitution by person found in violation of chapter 502), 502.604(2)(d) (allowing commissioner of insurance to obtain court order for restitution). It also ordered him to disgorge to the State of Iowa all commissions received from the sale of COCOTS. See id. § 502.604(2)(d) (allowing commissioner to obtain order providing for disgorgement by person found in violation of chapter 502). In addition, Pace was enjoined from violating chapters 502 and 523B, as well as section 714.16, and from selling unregistered securities and business opportunities in Iowa. The court imposed a civil penalty of $4000 ($1000 for each commission of an unlawful practice), and a civil penalty of $1000 ($250 for each commission of consumer fraud against the elderly). See id. §§ 714.16(7) (providing for civil penalty of up to $40,000 per violation of section 714.16), 714.16A(1) (providing for civil penalty of up to $5000 for each violation of section 714.16 committed against an older person). Pace was made responsible for court costs, costs of investigation, and reasonable attorney fees. See id. § 714.16(11) (permitting recovery of court costs, investigative costs, and attorney fees).

Pace appealed the trial court's decision. He asserts several grounds for reversal: (1) the court erred in holding the sale/leaseback plan was a security under chapter 502; (2) the court erred in concluding Pace was an "agent" under chapter 502 rather than an "affiliate" entitled to the section 502.503(1) defense based on an affiliate's lack of knowledge of the facts upon which liability is based; (3) the State failed to prove the representations made by Pace were untrue; (4) the State failed to prove consumer fraud; and (5) Pace was denied his federal and state procedural due process rights.[1]

1. Pace also argues the trial court erred in      concluding the sale/leaseback option met the

## II. Scope of Review.

A. *Statutory claims.* Our review of this equity action is de novo. *See State ex rel. Goettsch v. Diacide Distribs., Inc.,* 561 N.W.2d 369, 371 (Iowa 1997); *State ex rel. Miller v. Rahmani,* 472 N.W.2d 254, 257 (Iowa 1991). Nonetheless, the appellant is not entitled "to a trial de novo, only review of identified error de novo." *Hyler v. Garner,* 548 N.W.2d 864, 870 (Iowa 1996) (emphases omitted). Consequently, "our review is confined to those propositions relied upon by the appellant for reversal on appeal." *Id.*

■ The State must prove the alleged violations of the consumer fraud act by a preponderance of clear, convincing, and satisfactory evidence. *See Rahmani,* 472 N.W.2d at 257. The standard of proof with respect to the violations of Iowa's securities law is a mere preponderance of the evidence. *See Goettsch,* 561 N.W.2d at 373.

B. *Constitutional claims.* The defendant's constitutional claims are also reviewed de novo. *Fisher v. Iowa Bd. of Optometry Exam'rs,* 510 N.W.2d 873, 875 (Iowa 1994).

definition of "business opportunity" under chapter 523B. He claims this investment could not be both a "security" under chapter 502 and a "business opportunity" under chapter 523B. We do not address this issue, however, because the trial court's finding did not prejudice Pace for two reasons. First, the court specifically declined to rule that Pace's sale of payphones under the sale/leaseback arrangement violated section 523B.2. The district court stated: "However, as the court concludes the sale/leaseback option constitutes a security and is subject to the more stringent registration provisions of chapter 502, the court finds each offer by Mr. Pace of options one and two constitutes a violation of section 523B.[2]." (Pace does not challenge the trial court's conclusion that options one and two were unregistered business opportunities, giving rise to violations of section

## III. Was the Sale/Leaseback Option a Security?

With certain exemptions not relevant here, Iowa Code chapter 502 prohibits the offer or sale of any security in this state unless it is registered under this chapter. Iowa Code § 502.201. The statutory definition of "security" includes an "investment contract." *Id.* § 502.102(19). Pursuant to his statutory authority, *see id.* § 502.607, the commissioner of insurance has adopted a definition of "investment security" that includes

[a]ny investment in a common enterprise *with the expectation of profit to be derived through the essential managerial efforts of someone other than the investor.* In this rule, a "common enterprise" means an enterprise in which the fortunes of the investor are tied to the efficacy of the efforts and successes of those seeking the investment or of a third party.

Iowa Admin. Code r. 191—50.15(1) (emphasis added). This definition is derived from the United States Supreme Court's decision in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).[2]

523B.2.) Second, all monetary relief awarded by the trial court was independently supported by Pace's violations of chapter 502, section 714.16, or section 714.16A, making any findings peculiar to chapter 523B of no practical significance. Therefore, we limit our review of the judgment entered against the defendant to those issues that arise under chapter 502, section 714.16, and section 714.16A.

**2.** Because our securities law is somewhat patterned after federal securities law, we look to federal decisions for guidance in interpreting our state statute. *See Goettsch,* 561 N.W.2d at 372; *State v. Tyler,* 512 N.W.2d 552, 556 (Iowa 1994). Our reliance on federal cases is tempered, however, by the differing purposes of federal and state securities laws. "The suppression of fraudulent practices and the

Pace asserts the COCOTS he sold were not investment contracts because there was not an expectation of profit derived from the managerial efforts of someone other than the investor. He relies on a case from the Eleventh Circuit Court of Appeals that considered the purchase and leaseback of payphones by one of the companies through which Pace sold COCOTS. *See SEC v. ETS Payphones, Inc.,* 300 F.3d 1281 (11th Cir.2002), *rev'd, SEC v. Edwards,* 540 U.S. ——, 124 S.Ct. 892, 157 L.Ed.2d 813 (2004). In the *ETS Payphones* case, the circuit court held the fixed payments expected by the investors could not "be considered participation in earnings" and therefore the investors had no "expectation of profits" so as to render the sale/leaseback of payphones a security within the scope of federal securities law. *Id.* at 1283–84. Moreover, the court held, because the returns to investors were contractually guaranteed, those returns "were not derived from the efforts of [others]." *Id.* at 1285.

This decision was recently reversed by the United States Supreme Court. *See Edwards,* 540 U.S. at ——, 124 S.Ct. at 896, 157 L.Ed.2d at 819. The Supreme Court noted in its decision that the "expectation of profit" element of the *Howey* test referenced the profit or return anticipated by the investor, not the profit of the enterprise in which he or she invested. *Id.* at ——, 124 S.Ct. at 897, 157 L.Ed.2d at 820–21. Consequently, whether the investor participates in the profits of the underlying enterprise or is guaranteed a fixed rate of return is not determinative. *Id.* What is important is whether the investor's profit or return is dependent on the efforts of others. *Id.* at ——, 124 S.Ct. at 898, 157 L.Ed.2d at 821–22. When it is, the scheme is an investment contract notwithstanding the promise of a fixed rate of return. *Id.* The Court reversed the court of appeals' decision that the sale and leaseback of payphones was not a security within the scope of federal securities law. *Id.* at ——, 124 S.Ct. at 899, 157 L.Ed.2d at 822.

We agree with the reasoning of the Supreme Court and find it consistent with our interpretation of the term "investment contract" under Iowa law. In *State v. Tyler,* 512 N.W.2d 552 (Iowa 1994), we held an investor expected a "profit" where the note evidencing her $2000 investment required a $20,000 payment. 512 N.W.2d at 556 (applying *Howey* test). We concluded the note was an investment contract regulated by chapter 502. *Id.* Thus, this court has not hesitated to hold that an investment with a promised fixed return falls within the scope of state securities law.

■■ Examining the facts of the present case, we agree with the district court that under the sale/leaseback option sold by the defendant, any return or profit anticipated by the investors—fixed or not—would necessarily result from the labor of others because the investors contributed no managerial efforts to the initial or ongoing operation of the payphone. Therefore, the COCOT was an investment contract and a security within the scope of chapter 502. *See State v. Kraklio,* 560 N.W.2d 16, 19 (Iowa 1997) (holding solicitation of $300

protection of the public from their own gullibility are commonly accepted as the primary purposes of Blue Sky Laws." *Lolkus v. Vander Wilt,* 258 Iowa 1074, 1079, 141 N.W.2d 600, 603 (1966); *accord Midwest Mgmt. Corp. v. Stephens,* 291 N.W.2d 896, 901 (Iowa 1980) (stating Iowa's law exists to protect the public

from "deceit perpetrated in the sale of securities" and should be "liberally construed to effectuate [that] purpose"). National securities laws have the "broader purpose of protecting the integrity of the increasingly nationalized [securities] market." *King v. Pope,* 91 S.W.3d 314, 320 (Tenn.2002).

from each investor for defendant's preparation and pursuit of investor's claim in class action was the sale of a security because the investors had "neither the desire nor the expertise to manage the investment [the claim] themselves"). The trial court was correct in so ruling.

## IV. *Was Pace an "Affiliate" Rather Than an "Agent"?*

Pace argued at trial that he was an "affiliate," not an "agent" as found by the trial court, a distinction that would affect his culpability under chapter 502. In order to understand and address this contention, it is helpful to briefly review some of the pertinent provisions of chapter 502.

Section 502.201 makes it "unlawful for any person to offer or sell any security . . . unless . . . [i]t is registered under this chapter." Iowa Code § 502.201(1). Section 502.301 makes it "unlawful for any person to transact business in this state as a *broker-dealer or agent* unless . . . [t]he person is registered under this chapter." *Id.* § 502.301(1)(*a*) (emphasis added). Any person who violates either prohibition is "liable to the person purchasing the security." *Id.* § 502.501. Furthermore, section 502.503 imposes liability on "[a]ffiliates of a person liable under section 502.501," broker-dealers, and agents "who materially aid and abet in the act or transaction constituting the violation." *Id.* § 502.503(1). Joint and several liability is not imposed, however, if the aider and abettor proves he or she "did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability [under section 502.501] is alleged to exist." *Id.* § 502.503(1)(*a*).

An "affiliate" is "a person who directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the person

specified." *Id.* § 502.102(2). In contrast, an "agent" is defined as "any individual other than a broker-dealer who represents a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities." *Id.* § 502.102(3). A "broker-dealer" is "any person engaged in the business of effecting transactions in securities for the account of others or for such person's own account." *Id.* § 502.102(5).

▮ Reading these provisions together, it is apparent that the law imposes liability on the person who actually sells an unregistered security without regard to that person's knowledge of the facts giving rise to the violation. *See id.* § 502.501. In contrast a person who merely aids or abets the violation has no liability if he or she can prove a reasonable lack of knowledge of such facts. *See id.* § 502.503(1). Pace seeks to be categorized as an affiliate who merely aided and abetted the prohibited transactions without knowledge that the investments were required to be registered. Such a conclusion is not possible under this record, however, because Pace was a primary violator: the individual who actually made the prohibited offers and sales. *See generally Goettsch,* 561 N.W.2d at 373 ("Aiding and abetting is 'a method by which courts create secondary liability' in persons *other than the violator of the statute.*" (Citation omitted and emphasis added.)).

As previously noted, status as an affiliate is determined in reference to "the person specified." *Id.* § 502.102(2) (defining "affiliate" as "a person who directly, or indirectly . . ., controls, is controlled by, or is under common control with, *the person specified* " (emphasis added)). Turning to section 502.503, the statute imposing affiliate liability, we conclude "the person specified" for purposes of that statute is the person who sold the unregistered security or who sold a security without being a

registered agent. This conclusion is based on the language of section 502.503, which imposes joint and several liability on "[a]ffiliates *of a person liable under section 502.501* " who aid and abet the prohibited transaction. *Id.* § 502.503 (emphasis added). The person liable under section 502.501 is the person who violated the registration requirements of section 502.201(1) or section 502.301. *See id.* § 502.501. We think that person was clearly Pace.

As noted above, section 502.201 makes it unlawful for any person to sell an unregistered security. The record plainly establishes that Pace sold unregistered securities. Section 502.301 makes it unlawful for any person to transact business as an "agent" without being registered. An agent is a person who represents an issuer "in effecting ... sales of securities." *Id.* § 502.102(3). Again, the record clearly establishes that Pace represented various marketing and management companies in the sale of COCOTS, which we have found to be securities. Although Pace argues that he did not represent the management companies, this contention is without merit, as he sold the sale/leaseback option as a package deal.

Because Pace personally violated sections 502.201 and 502.301, Pace is "the person liable under section 502.501," as referenced in section 502.503(1). Therefore, it is literally impossible for him to be an affiliate in these transactions, as an affiliate in this case is a person directly or indirectly controlled by Pace, "the person specified" in section 502.503(1). *Id.* § 502.102(2). Consequently, the district court correctly determined the defendant's liability under chapter 502 without consideration of his purported lack of knowledge of the facts giving rise to the statutory violations.

## V. *Did Pace Commit an Unlawful Practice Prohibited by the Consumer Fraud Law in His Sale of COCOTS?*

The trial court held that Pace violated Iowa Code section 714.16, which provides in relevant part:

> The act, use or employment by a person of an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission, in connection with the lease, sale, or advertisement of any merchandise ..., whether or not a person has in fact been misled, deceived, or damaged, is an unlawful practice.

*Id.* § 714.16(2)(*a*). This statute is not a codification of common law fraud principles. *See State ex rel. Miller v. Hydro Mag, Ltd.*, 436 N.W.2d 617, 622 (Iowa 1989). It permits relief upon a lesser showing that the defendant made a misrepresentation or omitted a material fact "with the intent that others rely upon the ... omission." Iowa Code § 714.16(2)(*a*).

In the present case, the trial court found that Pace made the following false, deceptive and misleading representations to consumers in selling COCOTS: (1) "an investment in COCOTS was guaranteed and was as safe or safer than bank certificates of deposit, annuity products, and insurance products"; (2) "the COCOTS program he offered was properly registered for sale in Iowa"; (3) the investors "would receive a 14% annual return on their COCOT investment and ... they would receive a return of ... 114% on their money"; (4) the investors "would own an asset in the form of a payphone"; and (5) "the payphone companies were financially strong." In addition, the court found that Pace "failed to share facts [that] would have been ma-

terial [to investors] in making a decision to invest money in COCOTS." The material, undisclosed facts included: (1) the investment was high risk; (2) the high returns promised by the management companies could not realistically be expected; (3) the program was a Ponzi scheme; (4) the offers were not registered as a security or a business opportunity; (5) Pace was not registered as a securities agent in Iowa; and (6) Pace received significant commissions for each sale and he was required to return his commission should an investor liquidate his or her investment.[3] *See generally Goettsch,* 561 N.W.2d at 378 (defining a Ponzi scheme).

Pace challenges the trial court's finding of consumer fraud on three bases. He denies making the statements attributed to him by the trial court and contends that even if he did make these representations, they were not shown to be false. He also claims that he acted innocently because he simply passed along the information he received from the marketing companies and had no idea this information was false.

▇▇▇ Addressing the last argument first, we point out that it is not necessary for the State to prove that the violator acted with an intent to deceive, as is required for common law fraud. *See Miller v. William Chevrolet/GEO, Inc.,* 326 Ill. App.3d 642, 260 Ill.Dec. 735, 762 N.E.2d 1, 12 (2001) (interpreting identical statutory language and stating, "Nor need the defendant have intended to deceive the [investor]."); *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 691 A.2d 350, 365 (1997) (interpreting nearly identical statutory language and stating, "[a]n intent to deceive is not a prerequisite to the imposition of liability"). As we noted above, the only intent required by the statute is that the defendant act "with the intent *that others rely*" upon his omissions. Iowa Code § 714.16(2)(*a*) (emphasis added). In addition, there is no requirement under the statute that a violator have knowledge of the falsity of his or her representations. *See Gennari,* 691 A.2d at 365 ("One who makes an affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive."). Similarly, the Iowa statute does not require knowledge with respect to the omission or concealment of a material fact. *See Miller,* 260 Ill.Dec. 735, 762 N.E.2d at 12 (holding "innocent misrepresentations or material omissions" are actionable under consumer fraud law that included "the concealment, suppression or omission of any material fact" within definition of unlawful practice); *cf. Gennari,* 691 A.2d at 365 (holding "[f]or liability to attach to an omission or failure to disclose, ... the plaintiff must show that the defendant acted with knowledge" under statutory definition of unlawful practice that included "*knowing* concealment, suppression, or omission of any material fact" (emphasis added)). Thus, the defendant's contention that he was misled by the payphone companies just like his clients is immaterial. Our consumer fraud statute places the consequences of being uninformed on the agent, not the investor.

▇▇▇ As for Pace's argument that he did not make the allegedly false statements, we point out the district court resolved the discrepancy between his testimony and that of the State's witnesses on this issue against Pace. Despite our de novo review, we rely on the trial court's assessment of

---

**3.** The court also held these misrepresentations and material omissions constituted securities fraud under section 502.401(2). Because the standard of proof is higher under section 714.16, we consider Pace's challenge to the court's findings of misrepresentation and material omission only under the consumer fraud provisions of chapter 714.

the credibility of the witnesses in evaluating the strength of the State's proof. *Rahmani,* 472 N.W.2d at 256. Furthermore, our appraisal of the record convinces us that Pace made the representations, as found by the trial court, that these representations were false, and that Pace failed to share material information with potential investors. We will not unnecessarily extend our opinion by detailing the evidence we have found to be clear, convincing, and satisfactory proof of the defendant's violation of section 714.16, as such a discussion would have little precedential value, and the parties already have the benefit of the trial court's thorough review of the pertinent evidence in its decision. Therefore, we turn to the defendant's constitutional claims.

## VI. *Were the Defendant's Constitutional Rights Violated?*

■ A. *"Retroactive" application of determination that COCOTS are securities.* Pace argues the decision in this case violated his constitutional due process rights because until the trial court rendered its decision in this case, there had been no adjudication that COCOTS were securities under Iowa law. This argument has no merit. " 'The principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student.' " *Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 311–12, 114 S.Ct. 1510, 1519, 128 L.Ed.2d 274, 288 (1994) (citation omitted); *accord Casey's Gen. Stores, Inc. v. Blackford,* 661 N.W.2d 515, 525 (Iowa 2003) (stating "judicial decisions generally operate retroactively and prospectively"). Accordingly, "[a] judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction." *Rivers,* 511 U.S. at 312–13, 114

S.Ct. at 1519, 128 L.Ed.2d at 289 (footnote omitted).

Furthermore, there is no constitutional prohibition against the retroactive application of judicial decisions, even those overruling prior precedent. *See State v. Monroe,* 236 N.W.2d 24, 37–38 (Iowa 1975) (stating "it is now well settled that the constitution neither prohibits nor requires retroactive application of [judicial] decisions"); 20 Am.Jur.2d *Courts* § 173, at 455 (1995). As the United States Supreme Court noted in its *Rivers* decision,

The essence of judicial decisionmaking—applying general rules to particular situations—necessarily involves some peril to individual expectations because it is often difficult to predict the precise application of a general rule until it has been distilled in the crucible of litigation.

511 U.S. at 312, 114 S.Ct. at 1519, 128 L.Ed.2d at 288. Pace voluntarily subjected himself to this peril when, as an unregistered agent, he sold COCOTS that had not been registered.

■ We also reject Pace's assertion that constitutional proscriptions against ex post facto laws are violated by applying the decision that COCOTS are securities to his case. *See* U.S. Const. art. I, § 10; Iowa Const. art. I, § 21. Even if we assume ex post facto limitations apply to this civil proceeding, the Ex Post Facto Clause is not violated here. *See generally State v. Corwin,* 616 N.W.2d 600, 601 (Iowa 2000) (noting that although "[p]urely civil penalties" are not subject to ex post facto restrictions, civil penalties that are intended to punish are subject to such limitations). Ex Post Facto Clauses "forbid the application of a new punitive measure to conduct already committed." *See id.* The civil remedies and penalties imposed here were not new: they were not enacted *after* Pace engaged in the prohibited acts. To the contrary, the statutes

providing for civil relief were adopted long before Pace decided to sell unregistered COCOTS without becoming a registered agent. Consequently, ex post facto principles are simply not implicated in this case.

■■■■ B. *Sufficiency of Notice That Sale of Unregistered COCOTS Was Unlawful.* Pace asserts he did not have "fair warning" that his conduct would subject him to the civil remedies and penalties of chapters 502 and 714 until the trial court in this suit determined that COCOTS were securities within the meaning of Iowa law. The due process requirement that citizens have fair notice of prohibited conduct is satisfied when the terms of a civil statute "are such that an ordinary person exercising common sense can sufficiently understand and fulfill its proscriptions." *Shriver v. Iowa Dep't of Transp.*, 430 N.W.2d 921, 925 (Iowa 1988); *accord United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 811–12, 98 L.Ed. 989, 996 (1954); *Fisher*, 510 N.W.2d at 876. In the sphere of economic regulation, this court has set forth the following guiding principles:

> Literal exactitude or precision is not necessary. If vagueness can be avoided by a reasonable construction, consistent with the statute's purpose and traditional restraints against judicial legislation, the statute must be interpreted in that way.
>
> Where economic regulation is involved, the statute is subject to a less strict vagueness test "because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action."

*Knepper v. Monticello State Bank*, 450 N.W.2d 833, 838 (Iowa 1990) (citations omitted).

■■■■ Chapter 502, including the statutory definition of "security," was enacted long before Pace began to sell COCOTS. This statute clearly requires registration of securities, as well as registration of the agents selling them. It also clearly prohibits misrepresentations and deception in the sale of such investments. The only aspect of the present case that was not expressly stated in the statute was the fact that COCOTS are securities and thus subject to regulation under chapter 502. The securities law does, however, specifically include "investment contracts" within the statutory definition of "security." In addition, the insurance department has adopted a detailed definition of the term "investment contract," which, as noted earlier, is based on a 1946 Supreme Court decision. In addition, our prior opinions in *Tyler* and *Kraklio* gave citizens notice of the breadth of this term. *Cf. State v. Hunter*, 550 N.W.2d 460, 465 (Iowa 1996) ("A statutory term provides fair warning if the meaning of the word 'is to be fairly ascertainable by reference to similar statutes, *prior judicial determinations*, reference to the dictionary, or if the questioned words have a common and generally accepted meaning.'" (Citation omitted and emphasis added.)), *overruled on other grounds by State v. Robinson*, 618 N.W.2d 306, 312 (Iowa 2000). Thus, Pace's due process rights were not violated merely because the agency rule did not explicitly state that COCOTS are investment contracts.

This court has "recognized that in 'regulating certain matters a degree of indefiniteness is necessary to avoid unduly restricting the applicability of the proscribing rule.'" *Fisher*, 510 N.W.2d at 876 (citation omitted). As a practical matter, it would be impossible and counterproductive for the legislature or the insurance department to list all transactions that fall within the scope of the term "investment contract." *Cf. Eaves v.*

*Bd. of Med. Exam'rs,* 467 N.W.2d 234, 236 (Iowa 1991) (holding that statute prohibiting "[k]nowingly ... engaging in ... practice harmful or detrimental to the public" gave sufficient notice to doctors, stating "[i]t would be impossible to catalog all the types of professional misconduct"). A degree of indefiniteness is essential to prevent circumvention of the statute through the development of creative transactions that would fall outside even the most exhaustively crafted list of regulated investments. *See Kraklio,* 560 N.W.2d at 18 ("[T]he term 'investment contracts' is included within the definition of security 'to identify unconventional instruments that have the essential properties of a debt or equity security.'" (Citation omitted.)); *accord Howey,* 328 U.S. at 299, 66 S.Ct. at 1103, 90 L.Ed. at 1250 (recognizing need for flexible definition "to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits"). Consequently, the legislature is permitted some leeway to define the prohibited conduct in broad terms that can be reasonably applied to varying factual circumstances. That is what the legislature did here. Consequently, we think chapter 502 and the department's administrative rule gave the defendant fair notice that his sale of unregistered COCOTS as an unregistered agent was unlawful.

C. *Failure of State to Issue a Cease-and–Desist Order Prior to Commencing Civil Enforcement Proceeding.* The defendant's final argument rests on the failure of the Iowa Securities Bureau to issue a cease-and-desist order to Pace prior to the State commencing the present action against him. We first note that chapter 502 does not require the State to proceed progressively under the statute, using administrative remedies before it is permitted to pursue a civil or criminal enforcement action in court. Because there is no statutory basis for criticism of the procedure followed by the State in this case, Pace claims the State's decision to seek civil remedies without first ordering him to cease and desist violated his due process rights to notice and an opportunity to be heard. *See* U.S. Const. amend. XIV, § 1; Iowa Const. art. I, § 9.

Pace relies on a federal district court case to support his position, *Economou v. Wade,* 515 F.Supp. 813 (S.D.Iowa 1980). In *Economou,* the Iowa superintendent of securities had issued a cease and desist order against the plaintiffs directing them to stop the sale of unregistered securities in Iowa. *Economou,* 515 F.Supp. at 814. The plaintiffs claimed in a federal lawsuit that the superintendent's order violated their procedural due process rights because there was no prior notice or hearing on whether the plaintiffs were actually violating Iowa securities law. *Id.* The federal court held the plaintiffs' property interests were implicated by the agency order, but concluded the cease and desist order itself served as notice, and the post-order hearing offered to the plaintiffs in the order adequately protected their rights. *Id.* at 815. Pointing out that chapter 502 does not require notice and an opportunity for hearing before a cease and desist order is issued, the court specifically rejected the plaintiffs' contention that due process required a hearing *prior* to the issuance of the order. *Id.*

Contrary to the defendant's assertion in this case, the *Economou* decision does not stand for the proposition that a cease and desist order must precede a civil enforcement action. The *Economou* court simply held that the issuance of a cease and desist order with the opportunity for a prompt post-order hearing complies with due process.

Here, the initiation of the civil enforcement hearing was procedurally more favorable to the defendants than the cease and desist order was to the plaintiffs in *Economou.* In *Economou* the plaintiffs were required to immediately stop their sale of securities without first being afforded a hearing on whether their conduct violated Iowa securities law. *Id.* at 814. In contrast, here, the State asked for relief, including injunctive relief, only after "such notice and hearing" deemed reasonably required by the trial court. *See Quality Refrigerated Servs., Inc. v. City of Spencer,* 586 N.W.2d 202, 205 (Iowa 1998) ("The Due Process Clause requires that any deprivation of property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" (Citation omitted.)). Thus, the defendant's due process rights were not violated.

VII. *Summary.*

Upon our de novo review, we agree with the trial court that the COCOTS sold by Pace were investment contracts subject to the registration requirements of Iowa securities law. We also concur in the trial court's determination that the defendant was a primary violator of the securities statute, and not an affiliate. Therefore, the court correctly decided that the lack-of-knowledge defense was not available to Pace.

After independently evaluating the evidence, and relying on the trial court's credibility determinations, we conclude the State proved by a preponderance of clear, convincing, and satisfactory evidence that the defendant violated the consumer fraud provisions of section 714.16 by making misrepresentations and material omissions in his sale of payphones.

Finally, we find no constitutional infirmity in chapter 502 as applied to the transactions at issue in this case. In addition,

neither Pace's constitutional right to due process nor the constitutional prohibition against ex post facto laws was violated by the State's prosecution of this civil enforcement proceeding. Finding no error, we affirm.

AFFIRMED.