Robert R. BORGEN, Appellant,

v.

A & M MOTORS, INC., an Alaska Corporation, Mike Morelli, a Natural Person, and Credit Union 1, Appellees.

No. S–14073.

Supreme Court of Alaska.

March 30, 2012.

Robert C. Erwin, Robert C. Erwin, LLC, Anchorage, and LeRoy E. DeVeaux, DeVeaux & Associates, Anchorage, for Appellant.

Linda J. Johnson, Clapp, Peterson, Tiemessen, Thorsness & Johnson, LLC, Anchorage, for Appellees A & M Motors, Inc. and Mike Morelli.

No appearance by Appellee Credit Union 1.

Before: CARPENETI, Chief Justice, WINFREE, Justice, and MATTHEWS, Senior Justice.*

*OPINION*

MATTHEWS, Senior Justice.

The main issue presented in this case is whether under the Unfair Trade Practices and Consumer Protection Act a misrepresentation by a seller of the model year of a used motor home is subject to a defense that the misrepresentation was made in good faith. We answer in the negative because the Act clearly implies that unknowing affirmative misrepresentations of material facts will give rise to liability, and substantial authority from other jurisdictions that have similar statutes confirms this view.

## I. FACTS AND PROCEEDINGS

Robert Borgen bought a used Travelaire motor home from A & M Motors, Inc. in September 2004.[1] The motor home had previously been owned by Thom and Linda Janidlo; Thom Janidlo traded in the vehicle to A & M Motors about two weeks before Borgen bought it. When Janidlo traded in the motor home, he indicated that it was a 2002 model. At some point, someone changed the model year to 2003 on the documents at A & M Motors.

The title from the State of Alaska showed that the motor home was a 2003 model, but the vehicle identification number (VIN) indicated that the motor home was a 2002 model. Motor homes have two VINs, one on the chassis and one on the coach. Both trial experts testified that the tenth digit of a VIN of a chassis indicates the model year of the chassis, but their testimony as to whether the same holds true for the VIN of a coach was unclear. The VIN on the chassis is the VIN on the vehicle's title, but a motor home's model year is determined by the model year

of the coach. In this case, the tenth digit of both VINs was a 2. According to Edward Palmer, an executive of A & M Motors, A & M Motors checked the coach VIN of used motor homes it bought for resale. A & M Motors sold the Travelaire to Borgen as a 2003 model.

Borgen negotiated the purchase with Geno Hensley, a salesman Borgen knew socially. According to the Authorized Additions, Removal, and Repairs Agreement prepared by A & M Motors when it sold the motor home to Borgen, Mike Morelli was the sales manager for the transaction. Borgen did not remember having any direct contact with Morelli during the negotiations or purchase.

When Borgen purchased the Travelaire, he traded in his own used motor home and received a $6,000 used-vehicle allowance. After credit for the down payment and for the trade-in value of his used motor home, Borgen owed $46,491.14 on the Travelaire. A & M Motors helped arrange financing; Credit Union 1 loaned Borgen the money for the motor home.

In August 2005 Borgen discovered documents in the motor home indicating the motor home was actually a 2002 model. He contacted A & M Motors to complain; the only compensation they offered him was a $1,000 service contract.

Borgen became the sole owner of the motor home in 2005; at that time he refinanced the motor home in his name only. At some point Credit Union 1 asked the State of Alaska Division of Motor Vehicles (DMV) to research the title, and DMV changed the title to reflect that the motor home was a 2002 model.

Borgen sued A & M Motors, Hensley, and Morelli. Borgen pled three causes of action: (1) misrepresentation, (2) violation of the Unfair Trade Practices and Consumer Protection Act (UTPA), and (3) breach of contract. All three defendants answered and raised affirmative defenses. At first Morelli and A & M Motors had separate attorneys, but in

---

* Sitting by assignment made pursuant to article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

1. Borgen's girlfriend at the time, Michelle Crain, was a co-purchaser, but her name was removed from the title in 2005, after the couple separated. She was not a party to the lawsuit.

early May 2008 Morelli's attorneys began to represent A & M Motors as well.

Borgen moved for summary judgment on his UTPA claim in February 2008. Borgen principally relied on a North Carolina case in which the court found a violation of North Carolina's consumer protection statute when a dealer misrepresented the model year of a car.[2] The defendants filed a joint opposition, arguing that there were material factual disputes that precluded summary judgment. They also asserted that they were entitled to rely on the vehicle title, which showed that the motor home was a 2003 model, when they sold it as a 2003 model. In reply Borgen contended that the defendants were not entitled to rely on the title because Janidlo told them it was a 2002 model.

The defendants filed a joint motion for summary judgment in May 2008. They argued, among other things, that neither Hensley nor Morelli could be liable for any alleged breach of contract, as the contract was between A & M Motors and Borgen.

In a written decision dated December 24, 2008, the superior court granted summary judgment to Hensley and Morelli on the breach of contract claim. But it denied summary judgment to the parties on all of the other claims, finding that material issues of fact prevented entry of summary judgment. In its decision, the superior court interpreted this court's opinion in *Kenai Chrysler Center, Inc. v. Denison*[3] to mean that a mistaken but good-faith belief cannot be the basis of a UTPA claim. The superior court concluded that *Kenai Chrysler*'s good-faith-defense language was a distinguishing feature that made the North Carolina case relied upon by Borgen inapplicable:

> Mr. Borgen also relies on a North Carolina case in which a 1983 car was sold as a 1982.... In that case, the court said that defending the sale on the grounds that it was a mistake had no legal basis. *Myers v. Liberty Lincoln–Mercury, Inc.*, 89 N.C.App. 335, 336–37, 365 S.E.2d 663 (N.C.Ct.App.1988). It was "enough that

the goods bought were misrepresented." *Id.* at 337 [365 S.E.2d 663]. This case is at odds with Alaska law, under which the assertion of a good-faith, mistaken belief cannot be the basis of a UTPA claim. *See Kenai Chrysler Center*, 167 P.3d at 1256.

The case proceeded to trial against A & M Motors and Morelli in August 2010.[4] Borgen testified and presented testimony from Thom Janidlo and an expert, Chad Oyster. A & M Motors had three witnesses: Edward Palmer, an executive of A & M Motors; Peter Dunlap, the defense expert; and Shelly Mellott, a DMV employee.

Borgen testified about the purchase of the Travelaire and his discovery of documents showing that it was a 2002 model rather than a 2003 model. The documents he found were a new vehicle information statement, showing that both the coach and the chassis were 2002 models, and a distribution order, showing a manufacturing date of May 6, 2002. Borgen highlighted the changes from 2002 to 2003 that had been made to documents from A & M Motors. Borgen testified that he had never met Morelli before he sued him and had not talked to him during the purchase of the motor home.

Oyster, who worked for a different RV dealership, was qualified as an expert in RV sales and the evaluation of RVs for pricing purposes. He testified generally about the duties of a sales manager at an RV dealership, indicating that a sales manager "usually" is "the last word" in "negotiations for the purchase or sale of motor homes." He also testified that sales managers "evaluate motor homes, trade-ins, help select inventory" and "pretty much run the sales department." Oyster thought that in general it was reasonable for a dealer to rely on the vehicle's title to determine the model year, but he said if the owner of a used RV reported that the model year was different from the year on the title, he would investigate it further. Oyster testified that he had reviewed the manufacturer's statement of origin (MSO) for Borgen's Travelaire, and it showed that the

---

**2.** *Myers v. Liberty Lincoln–Mercury, Inc.*, 89 N.C.App. 335, 365 S.E.2d 663 (N.C.App.1988).

**3.** 167 P.3d 1240 (Alaska 2007).

**4.** Borgen dismissed Hensley from the suit in March 2009.

motor home was a 2002 model.[5] He agreed that the MSO is not available to a dealer when taking a trade-in. He said that the model year of a vehicle can be determined from the VIN because the tenth digit of the VIN shows the model year. In response to a juror's question about whether the model year could be determined from the coach VIN, Oyster answered that this might be possible, but he had not tried to determine the model year from the coach VIN in this case because he had seen the MSO. Oyster estimated that the difference in value between a 2002 and a 2003 model was between $5,000 and $10,000, but he said that he did not know whether Borgen overpaid for the Travelaire.

Janidlo testified that he thought the Travelaire was a 2002 model, as indicated in the service agreement he signed when he bought the motor home. He identified or discussed several documents related to his trade-in of the Travelaire. The initial trade-in evaluation from A & M Motors said that it was a 2002 model, but the model year had been changed to 2003 on a later document; Janidlo testified that he did not make the change or authorize it. Janidlo said that he did not make other changes in the documents from 2002 to 2003; he also said that the "2002" on the original trade-in evaluation was not in his handwriting. He indicated that Traveling Treasures, the company from which he bought the Travelaire, filled out the papers for the original title and he signed them. He was unaware that the title had the wrong model year on it and was always under the impression that the motor home was a 2002 model.

At the end of Borgen's case-in-chief, A & M Motors and Morelli asked for directed verdicts. The court granted Morelli's motion for a directed verdict because it decided that no evidence had been introduced from which a reasonable juror could conclude that Morelli made any misrepresentations to Borgen or had done anything that would amount to a UTPA violation. The court also granted the defendants' motion for a directed verdict on the punitive damages claim, finding that Borgen failed to present adequate evidence of outrageous conduct. The court denied A & M Motors's motion for a directed verdict because it decided that Borgen had introduced enough evidence for the jury to consider A & M Motors's intent.

Palmer of A & M Motors testified that the seller of a used motor home does not ordinarily have an MSO to show the model year; it only has the title from the state. A & M Motors introduced its valuation of the motor home when Janidlo traded it in; Palmer testified that A & M Motors actually paid Janidlo the value of a 2003 model. He said it was A & M Motors's practice to check the coach VIN of the motor homes it purchased for resale, but he also said that it relied on the title rather than the VIN for the model year. Palmer testified that A & M Motors had received titles with mistakes on them, specifically an incorrect VIN, but that it could not check the titles of all used motor homes.

Mellott testified that she was the office manager for the Anchorage DMV offices. She explained how DMV issues a vehicle title; she said that in this case, it appeared that "whoever processed the title looked at the application instead of the actual official [certificate of origin]" and that the original certificate said the vehicle was a 2002 model. Mellott said that A & M Motors should have been able to rely on the title, but she also said if A & M Motors had information that the title was incorrect, it could research the title. She estimated that it would take just a few minutes to research a newer vehicle title.

Dunlap, a former employee of A & M Motors, testified as an expert for A & M Motors. Dunlap described the trade-in process at A & M Motors in detail. Dunlap testified that A & M Motors would not look for an MSO or certificate of origin when taking a trade-in because the original documents are either with the state where the motor home was first registered or with the

---

5. When a vehicle is new, the manufacturer issues a document called a manufacturer's statement of origin (MSO) or a certificate of origin, which shows the model years and the VINs of both the coach and the chassis. The MSO is submitted to the state when the vehicle is registered for the first time; the state retains the MSO.

manufacturer. Dunlap also testified that the model year can be determined by looking at the tenth digit of the VIN; he said that the employee taking in a used motor home should check the VIN, but he did not specify which VIN. He said that the dealer would be able to rely on the title even if the customer selling the used motor home said that the model year was different from the year on the title because customers can be "misinformed or vague or unsure or wrong about a variety of different things related to their trade-in vehicle." He thought it was reasonable for A & M Motors to rely on the title. Dunlap could not say whether Borgen overpaid for the Travelaire; he thought Borgen had received more credit for his trade-in than it was worth. He testified that the changes to the documents probably happened after A & M Motors employees noticed that the model year on the title was different from what Janidlo told them.

At the close of all the evidence Borgen moved for a directed verdict and A & M renewed its motion for a directed verdict. The court denied both motions stating:

> I believe that a reasonable jury will have to determine the intent, motivation and circumstances of what happened here and may decide that it was all an innocent mistake and that there were no misrepresentations and no violation of the UTPA. And they could decide that there [was] a violation of the UTPA and that there was a misrepresentation.

The parties submitted proposed jury instructions before trial; A & M Motors submitted a proposed special verdict form. Both parties filed objections to the other side's proposed instructions. The biggest dispute over jury instructions was related to the UTPA instructions. Borgen proposed an instruction that would have required the jury to find that A & M Motors had committed a UTPA violation if the jury found that A & M Motors misrepresented the model year of the motor home. After the evidence was presented, Borgen asked the court to instruct the jury that the seller could commit an unfair trade practice by failing to investigate the validity of a title after learning of a potential problem with the title; as authority for this instruction, he relied on a Georgia case this court cited in *Kenai Chrysler Center, Inc. v. Denison.*[6] The superior court declined to give Borgen's UTPA instructions; instead, it used A & M Motors's proposed UTPA instructions, including one which allowed as a defense a good-faith but mistaken belief in the truth of a representation. The instruction also left it to the jury to decide whether A & M Motors was entitled to rely on the vehicle title. The jury was given a special verdict form with five questions.

The jury decided that A & M Motors had not engaged in an unfair or deceptive act in its dealings with Borgen. It then decided that A & M Motors had misrepresented the model year, that it knew or should have known that the statement was false or misleading, and that the misrepresentation was a legal cause of harm to Borgen. It found that A & M Motors had not breached its contract with Borgen. It found that Borgen suffered $3,097.50 in damages.[7]

---

**6.** 167 P.3d at 1256 (citing *Regency Nissan, Inc. v. Taylor,* 194 Ga.App. 645, 391 S.E.2d 467, 470 (1990)).

**7.** The special verdict as answered by the jury read as follows:

1. Is it more likely true than not true that A & M Motors engaged in an unfair or deceptive act in its dealings with Robert Borgen? Answer "yes" or "no." Answer: No
2. Is it more likely true than not true that A & M Motors misrepresented the model year of the Travelaire 280T motor home to plaintiff and that it was aware that the statement was false or misleading, or that a reasonably careful dealership under similar circumstances would have been aware the statement was false or misleading?

Answer "yes" or "no." Answer: Yes

. . . .

2(a) Was A & M Motor's misrepresentation the legal cause of injury to Robert Borgen? Answer "yes" or "no." Answer: Yes
3. Did A & M Motors breach its contract with Robert Borgen? Answer "yes" or "no." Answer: No

. . . .

4. If your answers to Questions No. 1, 2, and 3 all were "no," the jury foreperson should sign and date the Special Verdict Form where indicated. No further deliberations are necessary.

If any of your answers to Question No. 1, 2, or 3 were "yes," what are the damages if any, suffered by the plaintiff as a result of A & M Motors, Inc.'s conduct?

After the jury verdict was read, Borgen asked the court to poll the jury but did not object that the verdict was inconsistent. The court discharged the jury and instructed Borgen's attorney to prepare a judgment. The court stated that because the jury had not found a UTPA violation, attorney's fees would be awarded under Alaska Civil Rule 82. The court entered a final judgment in the case on October 11, 2010.

On October 20, 2010, Borgen moved for a judgment that A & M Motors committed a UTPA violation and breached its contract with him, notwithstanding the jury's verdict. Alternatively, he asked for a new trial. The day before, he had requested actual attorney's fees pursuant to the UTPA; his billing records showed that he incurred more than $100,000 in fees during the course of the case. A & M Motors opposed the attorney's fees motion, arguing that the court should award fees under Civil Rule 82.

The court denied the motion for a new trial or judgment NOV. The court held that because Borgen failed to object to the alleged inconsistency of the verdict before the jury was discharged, he was barred "from arguing that any proposed inconsistency entitle[d][him] to a new trial as a matter of law." The court considered the potential inconsistency in the verdict when ruling on the motion for a judgment NOV. The court found Borgen's argument about the inconsistency of the verdict "unconvincing," noting that "[n]ot every misrepresentation is an unfair trade practice and the jury was specifically instructed that a good faith but mistaken belief cannot be the basis for a finding of an unfair or deceptive act or practice." Viewing the evidence in the light most favorable to A & M Motors, the court decided that the jury could have found that the misrepresentation about the model year was based on a good-faith but mistaken belief; on the contract claim, the court concluded that the jury could have decided that the model year was not material to the contract, so Borgen received what he bargained for. The court also denied the motion for a new trial. Independently weighing the evidence, the court de-

Total $3,097.50

cided that the verdict of $3,097.50 was not against the weight of the evidence.

Borgen requested reconsideration of the court's order denying his motion for judgment NOV, taking issue with the court's conclusion that in the context of a commercial transaction not every material misrepresentation is an unfair trade practice and arguing that the court's conclusion was contrary to the language of AS 45.50.471(b)(12). Borgen also claimed that the court was mistaken in relying on *Kenai Chrysler Center, Inc. v. Denison* as a basis for concluding that good faith would be a defense to the claim under review since the issue in *Kenai Chrysler* was not misrepresentation but whether or not a contract was valid. The court denied the request for reconsideration.

The court awarded Rule 82 fees of $686.69 to Borgen. The court decided that there was "no basis" for awarding enhanced fees and that "[n]othing about the requested fees appear[ed] justified."

Borgen appeals. In his brief on appeal he lists eight issues presented for review and presents six captioned arguments. Borgen's argument headings are as follows:

I. The Trial Court Erred In Failing to Give the Proposed Jury Instruction of Plaintiff.

II. The Trial Court Erred In Granting a Directed Verdict for Mike Morelli at the Close of Plaintiff Borgen's Case.

III. The Trial Court Erred In Failing to Grant a Judgment NOV or New Trial.

IV. The Trial Court Should Have Granted a New Trial.

V. The Trial Court Abused Its Discretion Or Erred As A Matter Of Law In The Grant of Attorney's Fees Herein.

VI. The Trial Court Erred as a Matter of Law in Holding the Inconsistent Verdict Could Not Be Raised Because It Had Been Waived.

## II. DISCUSSION

### A. The Unfair Trade Practices And Consumer Protection Act

Alaska's Unfair Trade Practices and Consumer Protection Act (UTPA) [8] is based on a model act of the same name developed by the Federal Trade Commission in collaboration with the Council of State Governments.[9] All states have now adopted legislation prohibiting unfair or deceptive acts or practices in trade or commerce.[10] Almost all the state acts generally declare to be unlawful "unfair or deceptive acts or practices" in the conduct of trade or commerce.[11] This language duplicates the broad proscriptive language contained in section 5(a)(1) of the Federal Trade Commission Act.[12] A number of statutes go further and itemize specific practices that are per se unlawful.[13]

Alaska's UTPA takes both the general and the per se approach. Subsection .471(a) of the UTPA declares "unfair or deceptive acts or practices in the conduct of trade or commerce" to be unlawful. Subsection .471(b) contains a long list of subparagraphs describing types of conduct that are by definition unfair or deceptive acts or practices and are thus unlawful. Borgen based his claim on three of these subparagraphs: (b)(6), (11), and (12).[14] The Act provides for treble damages [15] and for an award of full reasonable attorney's fees to a prevailing plaintiff.[16] The Act also states that when interpreting section .471 "due consideration and great weight should be given" interpretations of section 5(a)(1) of the Federal Trade Commis-

---

8. AS 45.50.471–.561.

9. William A. Lovett, *State Deceptive Trade Practice Legislation*, 46 Tul. L.Rev. 724, 730 (1972). The current version of the model act appears at 29 Suggested State Legislation 141 (1970).

10. Restatement (Third) of Unfair Competition § 1 statutory note (1995).

11. *Id.* In some states the prohibition extends to "false, misleading, or deceptive" acts. *Id.*

12. 15 U.S.C. § 45(a)(1) (2006).

13. Marshall A. Leaffer & Michael H. Lipson, *Consumer Actions Against Unfair or Deceptive Acts or Practices: The Private Uses of Federal Trade Commission Jurisprudence*, 48 Geo. Wash. L.Rev. 521, 531 (1980) (footnote omitted):

> Presently, the largest number of UDAP [Unfair or Deceptive Acts or Practices] statutes contain language either identical to section 5—including unfair methods of competition—or a proscription against "unfair or deceptive acts or practices" alone. A substantial number of the statutes itemize certain deceptive practices that are *per se* unlawful, with or without a "catch-all" phrase designed to reach any others.

14. The provisions of section .471 relevant to this claim are as follows:

> (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful.
> (b) The terms "unfair methods of competition" and "unfair or deceptive acts or practices" include, but are not limited to, the following acts:
> . . . .
> (6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;
> . . . .
> (11) engaging in any other conduct creating a likelihood of confusion or of misunderstanding and which misleads, deceives or damages a buyer or a competitor in connection with the sale or advertisement of goods or services;
> (12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged. . . .

15. AS 45.50.531(a) provides:

> A person who suffers an ascertainable loss of money or property as a result of another person's act or practice declared unlawful by AS 45.50.471 may bring a civil action to recover for each unlawful act or practice three times the actual damages or $500, whichever is greater. The court may provide other relief it considers necessary and proper. Nothing in this subsection prevents a person who brings an action under this subsection from pursuing other remedies available under other law, including common law.

16. AS 45.50.537(a) provides:

> In an action brought by a private person under AS 45.50.471–45.50.561, a prevailing plaintiff shall be awarded costs as provided by court rule and full reasonable attorney fees at the prevailing reasonable rate.

sion Act.[17]

## B. Judgment NOV

### 1. Preliminary observations

We turn first to Borgen's argument that judgment NOV should have been granted in his favor on his UTPA claim. This argument encompasses three of the issues that Borgen lists as presented for review:

> Did the misrepresentation of the date of the motor home violate the consumer protection [act] as a matter of law?

> Was the finding of the jury that the date of the motor home was misrepresented binding on the court?

> Did the court abuse its discretion in failing to grant judgment NOV or a new trial where the jury had found the dealer had committed a material misrepresentation as to the date of the motor home?

We note at the outset of our discussion of this point that the terminology used by our Civil Rule 50 is not especially descriptive. Motions for a "directed verdict" under Rule 50(a) and motions for "judgment notwithstanding the verdict" under 50(b) can be based on any ground that entitles the movant to judgment as a matter of law. The Federal Rules of Civil Procedure, in recognition of

the problems posed by this nomenclature, now call a Rule 50(a) motion a "motion for judgment as a matter of law"; a Rule 50(b) motion is simply a "renewed motion for judgment as a matter of law."[18] Understanding this point is important in this case, because Borgen's claim here is, among other things, that he is entitled to judgment as a matter of law *because* of findings made in the special verdict, rather than *notwithstanding* them. We have previously affirmed the grant of judgment notwithstanding the verdict based on findings in a special verdict that were dispositive for the movant.[19]

 Motions for judgment notwithstanding the verdict present questions of law that are reviewed on appeal de novo rather than deferentially.[20] Where such a motion is evidence based, a trial court can only grant the motion where the evidence is such that, when viewed in the light most favorable to the nonmoving party, reasonable people could not differ in their judgment; an appellate court must use the same test.[21]

 This case involves the use and interpretation of a special verdict. Special verdicts are provided for by Alaska Civil Rule 49(b).[22] The rule contemplates that written

---

17. AS 45.50.545.

18. Wright & Miller discuss the nomenclature change to Federal Rule 50 as follows:

> The Advisory Committee Note to the 1991 amendment explains that the former language "is misleading as a description of the relationship between judge and jury. It is also freighted with anachronisms...." Although the amendment was not intended to alter the substantive content of the standard, the new language seems consistent with a mood of curbing inhibitions against granting the motion. The Note assures that "action taken under the rule ... is not an intrusion on any responsibility for factual determinations conferred on the jury by the Seventh Amendment or any other provision of federal law," and stresses that the revision "aims to facilitate the exercise by the court of its responsibility to assure the fidelity of its judgment to the controlling law...."
> 9B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2521, at 223–24 (3d ed. 2008) (footnotes omitted).

19. *L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1118–21 (Alaska 2009). *See also Gilbert v. City of Salinas*, No. H022128, 2002 WL 118609 at *6 (Cal.App. 2002):

> By rejecting plaintiff's claims against the four individual defendants, the jury removed any foundation for a verdict against the City. Therefore, the verdict cannot stand, and the trial court properly entered judgment notwithstanding that verdict.

20. *Cameron v. Chang–Craft*, 251 P.3d 1008, 1016–18 (Alaska 2011).

21. *Id.; Lynden, Inc. v. Walker*, 30 P.3d 609, 612 (Alaska 2001); *Mullen v. Christiansen*, 642 P.2d 1345, 1348 (Alaska 1982).

22. Civil Rule 49(b) provides:

> **Special Verdicts.** The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the

questions that lend themselves to brief answers may be submitted to the jury and the jury's answers are findings "upon each issue of fact" submitted. It is the duty of the court to apply the law applicable to the facts so found. "Under the special verdict procedure, the jury makes findings of fact and the court applies the law." [23] In cases where the jury's answers to the questions in a special verdict are potentially inconsistent, the trial judge should harmonize the answers if such is reasonably possible.

To give effect to the jury trial right in civil cases, a court must determine, by examining the pleadings, instructions, arguments, and evidence, whether there is a logical view of the case that harmonizes what seems at first to be an inconsistent verdict.[24]

"The touchstone in reconciling apparent conflict is whether 'the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted.' " [25]

 If the special verdict answers are not fairly capable of being reconciled, a new trial is ordinarily required:

> matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

23. 9B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2503, at 94 (3d ed. 2008).

24. *Schmit v. Stewart*, 601 P.2d 256, 256 (Alaska 1979). *See Yang v. Yoo*, 812 P.2d 210, 215 (Alaska 1991); *see also* 9B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2510, at 159–63 (3d ed. 2008) (quoting *Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962)):

> The case law establishes that it is the duty of the district judge to attempt to harmonize the jury's answers, if it is at all possible under a fair reading of the responses. As the Supreme Court stated almost a half-century ago: "Where there is a view of the case that makes

If the jury's answers are inconsistent with each other even when the presiding judge views them in the most generous way to avoid such a conclusion, a new trial under Rule 59(a) ordinarily is the proper pathway for the trial judge to follow and may be the required course.... [26]

The ultimate reason why a new trial may be necessary in case of a material, irreconcilable conflict in special verdict answers is to give effect to the constitutional right to a jury trial.[27]

### 2. Arguments of the parties

Borgen argues that he should have been granted judgment NOV because all of the elements that were necessary to establish an actionable misrepresentation under the UTPA were proven. He bases this argument on the special verdict answers that found that A & M Motors either knowingly or negligently misrepresented the model year of the motor home and that the misrepresentation caused damage to him. He also argues that the facts as to the misrepresentation were undisputed and thus, by implication, regardless of the special verdict, he was entitled to judgment NOV. As to the re-

> the jury's answers to special interrogatories consistent, they must be resolved that way."

25. *White v. Grinfas*, 809 F.2d 1157, 1161 (5th Cir.1987) (quoting *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir.1973)).

26. 9B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2510, at 166–70 (3d ed. 2008); *see State v. Lewis*, 785 P.2d 24, 27 (Alaska 1990) (internal inconsistencies in special verdict required new trial).

27. *See Yang*, 812 P.2d at 215 (failure to reconcile "results in a collision with the Seventh Amendment" (quoting *Atl. & Gulf Stevedores*, 369 U.S. at 364, 82 S.Ct. 780)); *Schmit*, 601 P.2d at 256 (reconciliation necessary "[t]o give effect to the jury trial right in civil cases"). *See also Ratigan v. N.Y. Cent. R.R. Co.*, 291 F.2d 548, 557–58 (2d Cir.1961) (Friendly, J., concurring and dissenting) ("[T]he only proper course, once the jury was discharged, was to order a new trial; neither the district court nor we are permitted to guess which of the two answers the jury would have altered if the alleged inconsistency had been promptly explained. The ruling of the district judge, now affirmed by my brothers, seems to me to deprive the Central of its right to a jury trial.").

quired elements, he argues that to prove a violation of AS 45.50.471(b)(12) he needed to show simply a material misrepresentation and resulting damage. Since the special verdict established these elements, he contends that the court should have entered judgment under the UTPA in his favor. He asks this court to either correct this error or order a new trial:

> There is likewise no dispute as to the law to be applied. AS 45.50.471 sets forth the list of unlawful acts and practices under the Unfair Trade Practices Act. Section (b) specifically notes that misrepresentation of a material fact is a violation:
>
> > (12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged;
> >
> > . . . .
>
> The jury found material misrepresentation and damage therefrom, but no violation of the Act. This is clearly erroneous and the court must either correct the error or order a new trial.

In response to Borgen's argument, A & M Motors makes two contentions. It suggests first that Borgen is precluded from contending that the jury's finding of misrepresentation requires a finding of a UTPA violation:

> At no time during the life of this case, nor during the jury instructions, did Borgen ever discuss that a finding of liability on the misrepresentation claim would require a finding of liability on the UTPA claim. It was not until after the jury's decision that Borgen suddenly decided that the elements were essentially bound together. Borgen brought both claims before the jury. He gave the choice of which claim to apply to the jury. The jury chose misrepresentation rather than UTPA.

Second, A & M Motors argues that the affirmative defense as to a "good faith, but mistaken belief" applied to the UTPA claim but not the misrepresentation claim. A & M Motors contends that when viewing the evidence in a light favorable to it there was ample proof that any mistake it made was in good faith.

In reply, Borgen reiterates that the jury finding that A & M Motors had misrepresented the model year of the motor home was a misrepresentation within the meaning of subsection .471(b)(12) of the UTPA. He contends that this finding established the law of the case and raised the legal issue as to whether the finding also required the court to find a violation of the UTPA. Borgen then cites the case on which he previously relied in moving for summary judgment, setting out a block quote that states that under a similar North Carolina statute "a purchaser of misrepresented merchandise does not have to prove . . . bad faith . . . ; it is enough that the goods bought were misrepresented." [28]

### 3. Borgen is entitled to judgment under the UTPA.

 A & M Motors's argument that Borgen should be precluded from arguing that the jury's special verdict as to misrepresentation does not entitle him to judgment as a matter of law under the UTPA has no merit. Borgen has consistently presented a claim for misrepresentation under the Act. He based his motion for summary judgment on the misrepresentation subparagraphs of subsection .471(b) and contended that what he had to prove in order to be entitled to partial summary judgment under the Act was simply that a material misrepresentation was made. Further, he requested an instruction that closely followed the language of subsection .471(b)(6) of the Act. The instruction would, if given, have required the jury to find a violation of the UTPA if the jury found that the model year of the motor home was misrepresented.[29] Moreover, the jury was not

---

**28.** *Myers v. Liberty Lincoln–Mercury, Inc.,* 89 N.C.App. 335, 365 S.E.2d 663, 664 (1988).

**29.** Borgen's proposed jury instruction number 3 provided:

> Mr. Borgen claims that the Defendants misrepresented the model year of the motor home as a 2003 when it was not and thus violated the Alaska Unfair Trade Practice and Consum-

asked to choose between liability under the UTPA and liability under a common law theory of misrepresentation.[30] The jury was not instructed that a finding of misrepresentation would not lead to liability under the UTPA, nor was it instructed that only if it found that A & M Motors had engaged in an unfair or deceptive act would it be liable under the UTPA. In fact, the instructions given by the court did not at any point mention the UTPA.

A & M Motors is correct in observing that the court instructed the jury that "[a] good faith, but mistaken belief cannot be the basis for a finding of an unfair or deceptive act or practice"[31] and that the court did not similarly permit good faith to serve as a defense to misrepresentation. A & M Motors is also right in its argument that there was sufficient evidence to support a jury conclusion that it had acted with a good-faith but mistaken belief as to the model year of the motor home. But these points highlight rather than resolve the legal question as to whether a claim of misrepresentation brought under one of the subparagraphs of subsection .471(b) of the Act is subject to a good-faith defense.[32]

 We now turn to this question. Under subsection .471(b)(12), "using ... misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with

the sale ... of goods ... whether or not a person has in fact been misled, deceived or damaged" is unlawful under the UTPA.[33]

This subparagraph implies that affirmative acts of misrepresentation need not be knowing; "knowingly" only applies to acts of concealment, suppression, or omission. Permitting a defense of good faith would generally excuse unknowing affirmative misrepresentations, and thus would conflict with the evident legislative intent to impose liability for them.

Other courts construing similar statutes have held that a seller's good or bad faith is unimportant when there is an affirmative misrepresentation and buyers can recover for unknowing misrepresentations without having to prove bad faith or disprove a seller's assertion of good faith. Examples of such authorities include:

- *Duhl v. Nash Realty Inc.*,[34] construing a section of the Illinois Consumer Fraud and Deceptive Business Practices Act having a similar structure to subparagraph (b)(12) of section .471 of the Alaska Act:

 [I]t is well established that under the Act the intention of the seller (his good or bad faith) is not important and a plaintiff can recover under the Act for innocent misrepresentations.[35]

- *Gupta v. Asha Enterprises, LLC*,[36] construing a provision of New Jersey law with a similar structure to subsection .471(b)(12)

---

er Protection Act. If you find that the Defendants made the statement that the motor home was a 2003, and if you determine that this statement was a misrepresentation then you must find that the Defendants violated ... the Alaska Unfair Trade Practice and Consumer Protection Act.

**30.** AS 45.50.531(a) provides that a UTPA claim does not preclude other remedies, including common law remedies.

**31.** Instruction No. 35.

**32.** We note that Borgen objected to the good-faith instruction when it was proposed by A & M Motors on the grounds that good faith does not excuse a seller from its duty to investigate potential problems. Violation of a duty to investigate was the foundation for his theory of fault-based liability under the UTPA. He did not recede from this position when the court decided to give the instruction. Further, more generally, he based

his motion for summary judgment and his proposed instruction number 3 on a theory predicating liability under the UTPA on any material misrepresentation, even an innocent one. Thus Borgen did not waive his right to contend that good faith is not a defense to his claim. *See ASRC Energy Servs. Power & Commc'ns, LLC v. Golden Valley Elec. Ass'n, Inc.*, 267 P.3d 1151, 1160–61 (Alaska 2011) (no waiver regarding jury instruction where mid-trial objections were presented).

**33.** *See supra,* note 14.

**34.** 102 Ill.App.3d 483, 57 Ill.Dec. 904, 429 N.E.2d 1267 (1981).

**35.** *Id.* at 1277.

**36.** 422 N.J.Super. 136, 27 A.3d 953 (N.J.Super.App.Div.2011).

of the Alaska Act (i.e., prohibiting misrepresentation, or *knowingly* concealing):

> We have held that unlawful conduct can consist of . . . "an affirmative misrepresentation, even if not made with knowledge of its falsity or with an intent to deceive". . . .
>
> In contrast to a claim of actionable omission, which requires a finding that the defendant acted knowingly, one who makes an affirmative misrepresentation is liable under the [Consumer Fraud Act] even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive.[37]

● *State ex rel. Miller v. Pace*,[38] construing a section of Iowa's consumer fraud statute similar to subsection .471(b)(12): "[T]here is no requirement under the statute that a violator have knowledge of the falsity of his or her representations."[39] The defendant's claim that he was misled "just like his clients" was "immaterial."[40]

Both Ohio and Texas hold that intent or knowledge is not an element of a "laundry list" claim under their consumer protection statutes unless the statute itself so provides.[41] Thus, in *Smith v. Herco, Inc.*, the Texas Court of Appeals held that a seller's representation to a buyer that "he would own all of the interior" of his townhouse was actionable under the Texas Deceptive Trade Practices Act (DTPA) even though the seller relied on an incorrect survey in making the representation.[42]

Even where the applicable statute merely prohibits unfair or deceptive acts or practices without also making specific acts per se unlawful, courts have held that innocent material misrepresentations are deceptive acts which give rise to liability. For example in *Myers v. Liberty Lincoln–Mercury, Inc.*,[43] the court held that misrepresenting the model year of a vehicle was a violation of the deceptive act provisions of the North Carolina statute even if the misrepresentation was not intentional or fraudulent, but merely a mistake: "This contention has no legal basis, since to prevail in a Chapter 75 case, a purchaser of misrepresented merchandise does not have to prove fraud, bad faith or intentional deception as at common law; it is enough that the goods bought were misrepresented . . . ."[44]

*Myers* relied on a decision of the North Carolina Supreme Court, *Marshall v. Miller*.[45] In *Marshall* the question presented was whether bad faith was an essential element in a private action for misrepresentation under the North Carolina statute prohibiting deceptive trade practices. An intermediate appellate court had so held. The intermediate appellate court and the North Carolina Supreme Court recognized that federal decisions construing the F.T.C. Act "have uniformly held that the FTC may issue a cease and desist order to enforce Section 5 where an act or practice has a capacity to deceive, regardless of the presence or absence of good faith on the part of the offending party."[46] But, since the F.T.C. Act confers no private right of action, the question in *Marshall* was whether the private right of action afforded under the North Carolina statute should include an additional element of bad faith. The North Carolina Supreme Court answered this question in the negative, noting that nothing in North Carolina's prior ju-

---

**37.** *Id.* at 959 (quoting *Stoecker v. Echevarria*, 408 N.J.Super. 597, 975 A.2d 975, 990 (N.J.Super.App.Div.2009)).

**38.** 677 N.W.2d 761 (Iowa 2004).

**39.** *Id.* at 771.

**40.** *Id.*

**41.** *Fletcher v. Don Foss of Cleveland, Inc.*, 90 Ohio App.3d 82, 628 N.E.2d 60, 62 (1993); *Pennington v. Singleton*, 606 S.W.2d 682, 689–90 (Tex.1980).

**42.** 900 S.W.2d 852, 858–60 (Tex.App.1995). The buyer's claim was based in part on § 17.46(b)(7) of the Texas DTPA, which is identical to AS 45.50.471(b)(6). *Id.* at 858 & n. 4; AS 45.50.471(b)(6). AS 45.50.471(b)(6) was one of the bases of Borgen's UTPA claim.

**43.** 89 N.C.App. 335, 365 S.E.2d 663 (1988).

**44.** *Id.* at 664.

**45.** 302 N.C. 539, 276 S.E.2d 397 (1981).

**46.** *Id.* at 399.

risprudence concerning the statute "limits the precedential value of FTC jurisprudence to cases or actions brought by the Attorney General" and "unlike statutes enacted by some of our sister states, there is no explicit statutory requirement of a showing of bad faith." [47]

Another case that holds that "deceptive acts" under a consumer protection statute include innocent misrepresentations is *Bartner v. Carter.*[48] In *Bartner* the court stated:

> [T]he federal decisions are clear that a . . . practice or act may be "deceptive" even though defendant had no purpose to deceive, . . . and acted in good faith. . . . In view of those decisions, appellees cannot avoid liability merely because they made the misrepresentation in good faith and without purpose to deceive.[49]

The Connecticut Supreme Court interpreted its Unfair Trade Practices Act as not requiring proof that the defendant was aware that his misrepresentation was false:

> In keeping with the remedial purpose of the federal Unfair Trade Practices Act, other courts and commentators have interpreted the act not to require proof that the actor or declarant knew of the falsity of his statement or act. . . . On the basis of these prior holdings, we conclude that knowledge of falsity, either constructive or actual, need not be proven to establish a violation of [the Connecticut Unfair Trade Practices Act].[50]

Good faith or lack of intent to deceive are likewise not defenses under Vermont's Consumer Fraud Act.[51]

Because the standard for a deceptive act or practice is the capacity or tendency to deceive, several state and federal courts have determined that even truthful statements can be actionable under some circumstances because of the manner in which the facts are presented.[52] For example, the Washington Supreme Court held that collection notices for a subrogation claim were actionable under Washington's Consumer Protection Act because consumers could be misled into believing that the notices were related to "a liquidated debt that the recipient [was] bound to pay rather than a potential tort claim that [was] subject to dispute" even though the information in the notices was truthful.[53]

Section .545 of Alaska's UTPA mandates that "[i]n interpreting AS 45.50.471 due consideration and great weight should be given the interpretations of 15 U.S.C. § 45(a)(1) (§ 5(a)(1) of the Federal Trade Commission Act)." We have followed this section and have applied F.T.C. precedent to private claims brought under the UTPA.[54] As in other jurisdictions, bad faith is not an explicit element of a private action, nor is good faith an explicit defense.

Our case law has adopted the F.T.C. definition as to whether an act is deceptive. "Regarding the standard for deceptive practices, we held in *O'Neill Investigations* that '[a]n act or practice is deceptive or unfair if it has the capacity or tendency to deceive' where neither actual injury as a result of the deception nor intent to deceive were re-

**47.** *Id.* at 403.

**48.** 405 A.2d 194 (Me.1979).

**49.** *Id.* at 200.

**50.** *Web Press Servs. Corp. v. New London Motors, Inc.,* 203 Conn. 342, 525 A.2d 57, 68 (1987).

**51.** *Carter v. Gugliuzzi,* 168 Vt. 48, 716 A.2d 17, 24–25 (1998).

**52.** *Kraft, Inc. v. F.T.C.,* 970 F.2d 311, 322 (7th Cir.1992); *Pearce v. Am. Defender Life Ins. Co.,* 316 N.C. 461, 343 S.E.2d 174, 180 (1986); *deBondt v. Carlton Motorcars, Inc.,* 342 S.C. 254, 536 S.E.2d 399, 407 (App.2000); *State v. Kaiser,* 161 Wash.App. 705, 254 P.3d 850, 858 (2011).

**53.** *Panag v. Farmers Ins. Co. of Wash.,* 166 Wash.2d 27, 204 P.3d 885, 896, 903 (2009).

**54.** *See Kenai Chrysler Ctr., Inc. v. Denison,* 167 P.3d 1240 (Alaska 2007); *Odom v. Fairbanks Mem'l Hosp.,* 999 P.2d 123 (Alaska 2000). In *ASRC Energy Services Power & Communications, LLC v. Golden Valley Electric Ass'n, Inc.,* 267 P.3d 1151, 1158–63 (Alaska 2011), we held that section .545 of the UTPA would continue to be applied to the definition of "unfair . . . acts or practices" formulated in *F.T.C. v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244 n. 5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972) rather than to a modified, less consumer friendly definition of unfairness that was codified by Congress in 1994.

quired." [55] As we noted in *ASRC Energy Services Power & Communications, LLC v. Golden Valley Electric Ass'n, Inc.*, the Federal Trade Commission announced a modified standard for a deceptive act or practice subsequent to our decision in *O'Neill Investigations:* "[F]irst, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." [56] We concluded in *ASRC Energy* that this was not an appreciable change from the standard that we adopted in *O'Neill:*

> To show deception under the FTC Act, intent, scienter, actual reliance or damages, and even actual deception are unnecessary. All that it is required is proof that a practice has a tendency or capacity (or, under the FTC's latest formulation, is likely) to deceive even a significant minority of consumers. [57]

As noted by the North Carolina Supreme Court in *Marshall* and the Maine Supreme Court in *Bartner,* and as is suggested by our discussion of the definition of deceptive practices in *O'Neill* and *ASRC Energy,* F.T.C. precedent concerning whether an act or practice is deceptive does not permit a good-faith defense. [58]

The trial court believed that a good-faith defense was required based on *Kenai Chrysler Center, Inc. v. Denison.* [59] In *Kenai Chrysler* a developmentally disabled young man bought a car from a dealership. His parents, who also served as his guardians, contacted the dealership and sought to re-turn the car and rescind the contract on the grounds that the contract was void. The dealership refused and took a series of steps that were designed to make rescission more difficult. The parents brought suit under the UTPA and prevailed before a jury. On appeal we observed that in *State v. O'Neill Investigations, Inc.,* [60] we had adopted a multi-factored approach that should be considered in determining whether an "unfair" practice existed. [61]

The factors are:

(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers.... [62]

We noted that the trial court had instructed the jury on these standards and observed that "Kenai Chrysler correctly asserts that these provisions require proof of something more than the mere assertion of a good faith but mistaken belief that a contract was valid." [63] We then observed that other jurisdictions "focus on the unfairness of the disputed practice under the specific circumstances presented," noting that the Fourth Circuit described

> an unfair trade practice as an "inequitable assertion of power or position," ruling that

**55.** *ASRC Energy Servs.*, 267 P.3d at 1160 (quoting *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 534–35 (Alaska 1980)).

**56.** 267 P.3d at 1160 (quoting *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984)).

**57.** *Id.* at 1163 (quoting NATIONAL CONSUMER LAW CENTER, UNFAIR & DECEPTIVE ACTS & PRACTICES, § 4.2.3.1, at 190 (7th ed. 2008)).

**58.** *See Chrysler Corp. v. F.T.C.*, 561 F.2d 357, 363 n. 5 (D.C.Cir.1977) ("An advertiser's good faith does not immunize it from responsibility for its misrepresentations...."); *Regina Corp. v. F.T.C.*, 322 F.2d 765, 768 (3d Cir.1963); *Feil v. F.T.C.*, 285 F.2d 879, 896 (9th Cir.1960) ("Whether good or bad faith exists is not material, if the Commission finds that there is likelihood to deceive.").

*See also Bankers Sec. Corp. v. F.T.C.*, 297 F.2d 403, 405 (3d Cir.1961) (noting that ruling that advertising was deceptive did "not depend upon or even imply a finding that [the business] intended to deceive").

**59.** 167 P.3d 1240 (Alaska 2007).

**60.** 609 P.2d 520 (Alaska 1980).

**61.** *Kenai Chrysler Ctr.*, 167 P.3d at 1255.

**62.** *Id.* (quoting *O'Neill Investigations,* 609 P.2d at 535). These are the so-called *Sperry & Hutchinson* standards referred to *supra* note 54.

**63.** *Id.* at 1256.

"[a]lthough it may be rare that the exercise of a contractual right will meet this stringent standard, it is possible for such an exercise, when it involves egregious and aggravating conduct, to constitute an unfair ... trade practice...." [64]

Applying a "flexible, case specific approach" employed in the case law under discussion, the *Kenai Chrysler* court concluded that "reasonable jurors could fairly find that Kenai Chrysler's conduct went far beyond a simple assertion of the company's good faith belief that the sale contract was valid." [65]

■ The discussion in *Kenai Chrysler* concerned the definition of an "unfair" act or practice under subsection .471(a). More specifically, that case discussed standards for determining when the insistence upon contract rights could be considered an unfair act. The discussion in *Kenai Chrysler* does not apply to specific conduct prohibited under the subparagraphs of subsection .471(b) and is distinguishable on this basis. The discussion also does not apply to acts or practices that are "deceptive" as distinct from "unfair." The two terms are used in the disjunctive in section .471(a), and either will suffice to give rise to liability. Whether an act is "unfair" is determined by using the flexible and somewhat vague *Sperry & Hutchinson* standards, whereas whether an act is "deceptive" is determined simply by asking whether it "has the capacity or tendency to deceive." [66]

Material misrepresentations as prohibited under AS 45.50.471(b)(6) and (12) are by definition "unfair or deceptive acts or practices," and there is no need to independently define unfairness, or deception, when a violation of these subparagraphs is claimed.

A per se or automatic UDAP [Unfair or Deceptive Acts or Practices] violation occurs when a practice violates a specific UDAP guideline, and violation of that guideline automatically is a UDAP violation.

... All the court will have to do is determine if the practice occurred is that described in the specific guideline.[67]

This point is also made in the Alaska Pattern Jury Instruction that concerns violation of specific provisions of AS 45.50.471(b). The use note states: "The acts specified in AS 45.50.471(b) are unfair or deceptive by definition. Therefore, if this instruction is used, instructions 10.03A [defining deceptive practices] and 10.03B [essentially the *Sperry* factors defining unfair practices] are not required." [68]

■ Moreover, even if the per se approach as to listed violations under subsection .471(b) were not employed, the prohibition on deceptive acts or practices in subsection .471(a) also encompasses innocent material misrepresentations without requiring proof of bad faith or permitting a defense of good faith. We reach this conclusion based on F.T.C. precedent to which we give great weight, as well as case law from other jurisdictions reaching the same conclusion.[69]

■ Borgen is therefore correct that the elements of his case for misrepresentation under section .471 were that (1) A & M Motors misrepresented the model year of the motor home by representing that it was a 2003 model when in fact it was a 2002 model; (2) that this misrepresentation was material; and (3) that it caused him damage. He is also correct that these elements were established by the jury in answers to questions 2, 2a, and 4 of the special verdict.

■ Based on these findings, judgment should be entered in favor of Borgen unless they conflict with other findings in the special verdict. We find no conflict, based largely on the reconciliation offered by the trial court.

**64.** *Id.* (quoting *S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese,* 284 F.3d 518, 539–40 (4th Cir.2002)).

**65.** *Id.*

**66.** *ASRC Energy Servs. Power & Commc'ns, LLC v. Golden Valley Elec. Ass'n, Inc.,* 267 P.3d 1151, 1159–60 (Alaska 2011).

**67.** National Consumer Law Center, Unfair & Deceptive Acts & Practices § 3.2.1 (7th ed. 2008).

**68.** Alaska Civil Pattern Jury Instruction 10.01B (2005).

**69.** *See supra* text accompanying notes 43–58.

With respect to the special verdict finding that A & M Motors did not engage in an unfair or deceptive act, the jury could have found that A & M Motors was negligent in representing that the motor home was a 2003 model—because it was on notice of the potential problem and failed to investigate—but that it nonetheless acted in good faith because it had an honest belief based on the state title.[70] Reconciling the special verdict answers concerning misrepresentation with the answer that there was no breach of contract presents a closer question. Counsel for A & M Motors argued to the jury that there was no breach of contract because Borgen received the particular motor home that he contracted to buy and therefore the contract between Borgen and A & M Motors was not breached.[71] The superior court agreed that the jury could have so found. We also agree that in light of this argument the apparent conflict between the special verdicts on misrepresentation and breach of contract can reasonably be reconciled using the "logical and probable" standard.[72]

### C. Remaining Issues

In view of our decision that Borgen should have been granted judgment NOV on his UTPA claim most of the other points on appeal are moot. The two that are not moot are (1) whether he was entitled to judgment NOV or a new trial as to damages and (2) whether the court erred in granting a directed verdict for Mike Morelli. These require only brief discussion.

### 1. Damages

 As to damages, Borgen contends that the only evidence of damages was that presented by his witness, Oyster, who stated that the difference in value between a 2002 and 2003 Travelaire motor home was in the range of $5,000 to $10,000. He argues therefore that there was no justification for the jury's award of slightly more than $3,000. A & M Motors responds that Oyster's opinion of the difference in value related to the difference in value between a 2002 and 2003 Travelaire as of 2009, whereas the court's instructions required the jury to evaluate the difference as of the time of purchase in 2004. A & M Motors also points out that there was documentary evidence that was presented to the jury that inferentially showed only a $1,000 difference between the relevant model years as of the time of sale. Counsel for A & M Motors so argued before the jury. In addition, Borgen introduced the records showing both the amount A & M Motors gave the Janidlos for trading in the motor home and the amount it charged Borgen for the vehicle. In our view the testimony of Oyster and the documentary evidence established a range of values on which the jury could have based its damages verdict.[73] We therefore see no grounds for holding that the trial court should have granted a judgment NOV or a new trial on damages.

---

**70.** Hence the incorrect good-faith-defense instruction serves as the basis for harmonizing the special verdict. The fact that the instruction was incorrect is irrelevant for purposes of harmonization, for the fact of the instruction shows that the jury's reasoning was not illogical.

**71.** Counsel argued:

> Plaintiff claims that A & M breached its contract. What was the contract for? The contract was for a used RV. Mr. Borgen did not go to A & M looking for a 2003 TravelAire. He told you that. He said he walked on the lot and he wanted a good, used RV.... [T]hat's what he was sold. He was sold a used RV, [it] had a certain amount of mileage on it, it had certain options in it....
> ... So, what does material mean? Material. Did the fact that this was an '02 rather than an '03, would that have caused Mr. Borgen not to purchase this vehicle. No.... He went to the

> lot, he walked around, he saw one that he liked, he negotiated the deal, he traded in his own used RV and he was happy with the RV. He's driven it around. He still owns it. He hasn't tried to sell it.... He bought the RV because it was a nice, used RV.

**72.** *See supra* note 25.

**73.** *See Dowling Supply & Equip., Inc. v. City of Anchorage,* 490 P.2d 907, 909 (Alaska 1971) (holding that "some competent evidence as to the amount of damages" must be introduced); *Vlaskakis v. Ward,* 1985 WL 1077652 (Alaska 1985) (holding that "[s]ince the damages awarded by the trial court are within the range of evidence presented" award not clearly erroneous). *See also Conam Alaska v. Bell Lavalin, Inc.,* 842 P.2d 148, 154 (Alaska 1992) (noting that "courts are more lenient in allowing the jury to speculate as to the amount of damages" after causation has been proven).

### 2. Directed verdict for Morelli

With respect to Borgen's argument that the court erred in directing a verdict in favor of Morelli, Borgen argues that when the evidence is viewed in its strongest light in his favor, it creates a reasonable question for the jury as to whether Morelli was the person responsible for changing the sale documents concerning the motor home from "02" to "03." But the trial court found that there was no evidence that Morelli was involved in this transaction apart from the fact that he was sales manager of A & M Motors at the time of the sale and was listed as such on some of the sales documents.[74] We agree with the trial court that viewing the evidence most favorably toward Borgen, Morelli's connection to the transaction was too tenuous to serve as a basis for imposing individual liability on him either under the UTPA or on a theory of common law misrepresentation.[75]

### 3. Attorney's fees

Although Borgen's appellate point concerning the award of attorney's fees is moot, on remand the superior court must vacate the award of attorney's fees which it made to Borgen under Civil Rule 82 and make an award of full reasonable attorney's fees under subsection .537(a) of the UTPA.

## III. CONCLUSION

The special verdict established that Borgen is entitled to judgment for misrepresentation under section .471 of the UTPA and that the actual damages that he suffered as a result of the misrepresentation were $3,097.50. This sum must be trebled under AS 45.50.531(a). In addition, Borgen is entitled to an award of full reasonable attorney's fees under AS 45.50.537(a). No valid basis has been shown for reversing the judgment in favor of Morelli.

Accordingly, we AFFIRM the judgment in favor of Morelli, VACATE the judgment entered in favor of Borgen against A & M Motors, and REMAND this case with directions to enter a new judgment in favor of Borgen against A & M Motors under the UTPA and to award treble damages and attorney's fees in accordance with this opinion.

FABE, CHRISTEN, and STOWERS, Justices, not participating.

---

74. The court stated in ruling on the motion for directed verdict:

> He's the desk manager on one document. He's listed as the sales manager on another document. But there's no evidence that he was involved, spoke to Mr. Borgen. Mr. Borgen didn't say I spoke to Mr. Morelli.... There's no evidence that he made any representations as to the year of the vehicle ... or knew what the year was of the vehicle.... [T]he only thing I've heard about Mr. Morelli throughout your case in this matter is that Mr. Borgen thought he recognized him, had seen him around.... And I just haven't heard anything about him saying anything, representing anything, misleading anyone in any kind of way that I could attach—that I could find a reasonable jury would attach liability to. There's no testimony about him being involved at all in this deal.

75. We note that under the Federal Trade Commission Act employee liability for misrepresentation is not as broad as corporate liability:

> An individual is obligated to make consumer redress for violations of the FTC Act where he (1) participated in or had the authority to control the wrongful acts or practices; and (2) had some knowledge of the wrongful acts or practices. *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 470 (11th Cir.1996). To satisfy the knowledge requirement, the Commission does not need to demonstrate that the individual defendants possessed the intent to defraud, nor that the defendants had actual knowledge of the misrepresentations. *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 574 (7th Cir.1989). "Reckless indifference to the truth or falsity of the representations or an awareness of a high probability of fraud coupled with an intentional avoidance of the truth will suffice. Moreover, a defendant's participation in corporation affairs is probative of knowledge." *Id.*
> *F.T.C. v. SlimAmerica, Inc.*, 77 F.Supp.2d. 1263, 1276 (S.D.Fla.1999).